*Decisions will be entered under Rule 50.*

RALPH C. WILSON, SR., AND TENNA K. WILSON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

RALPH C. WILSON, JR., AND JANET M. WILSON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 684-62, 686-62. Filed June 13, 1966.

*John H. Fildew*, for the petitioners.
*Ralph W. Eisnaugle, Jr.*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioners' income taxes for the calendar year 1957 in the respective amounts set forth after their names:

Ralph C. Wilson, Sr., and Tenna K. Wilson_____ $69,539.28
Ralph C. Wilson, Jr., and Janet M. Wilson_____ 76,409.59

After certain concessions made by the parties, the following issues remain to be decided:

(1) Did the transfer of certain assets from Ralph C. Wilson Associates, Inc., to Ralph C. Wilson Agency, Inc., in exchange for cash, and the subsequent dissolution of Ralph C. Wilson Associates, Inc., constitute a corporate reorganization within the meaning of section 368(a)(1)(D) of the 1954 Code?[1]

(2) If there was a reorganization, is the gain realized by petitioners on the liquidation of Ralph C. Wilson Associates, Inc., taxable as a dividend under section 356 to the extent of that corporation's undistributed earnings and profits?

(3) If there was a reorganization, and if the gain on liquidation is taxable as a dividend under section 356, were the earnings and profits of Ralph C. Wilson Associates, Inc., increased by the gain realized upon the sale of certain investment stock?

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Ralph C. Wilson, Sr. (hereinafter referred to as Wilson), and Tenna K. Wilson are husband and wife residing in Grosse Pointe Park, Mich. Ralph C. Wilson, Jr. (hereinafter referred to as Wilson, Jr.), and Janet M. Wilson are husband and wife residing in Grosse Pointe Woods, Mich. Each couple filed a joint Federal income tax

---

[1] Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as applicable to the year 1957.

return for the calendar year 1957 with the district director of internal revenue, Detroit, Mich. Wilson, Jr., is the son of Wilson. Wilson and Wilson, Jr., will sometimes be referred to as petitioners.

Ralph C. Wilson Agency, Inc. (hereinafter referred to as Agency), was incorporated under the laws of the State of Michigan in 1939 for the purpose of engaging in the general insurance business. From the date of incorporation of Agency until June 1959 petitioners each owned 50 percent of its issued and outstanding stock. At the time of trial, all of such stock was owned by Wilson, Jr. From 1950 until at least 1960, Agency's registered office and principal place of business was at 1550 Guardian Building, Detroit, Mich. During 1957 and 1958, Wilson and Wilson, Jr., served as Agency's principal officers.

Sometime prior to April 12, 1949, a group of individuals unrelated to petitioners approached Wilson with the idea of organizing a corporation to sell large group insurance contracts. These individuals claimed to have the contacts necessary to sell such contracts, and they knew Wilson had an insurance license. Ultimately, on April 12, 1949, Ralph C. Wilson Associates, Inc. (hereinafter referred to as Associates), was incorporated under the laws of the State of Michigan. Petitioners each owned one-sixth ($\frac{1}{6}$) of the issued and outstanding stock of Associates; the rest of the stock was owned by six unrelated individuals.

From the date of its incorporation, Associates engaged in the business of selling large group insurance contracts to a limited number of clients. Large group insurance policies are policies covering a large number of persons (usually employees) affiliated with an insurable group. Provisions such as coverage, benefits, and rates are negotiated and drafted to meet the requirements of each group covered. Ordinary group insurance policies, on the other hand, usually cover smaller numbers of assureds and are "standard" contracts, the principal terms of which usually are not modified according to the requirements of the insured groups.

Initially Associates wrote hospitalization insurance and/or accidental death and dismemberment insurance for the following groups, the coverage for each group having begun on the respective date indicated:

| Group | Commencement date |
|---|---|
| Michigan Conference of Teamsters Welfare Fund | June 1, 1949 |
| National Truckaway and Driveaway Conference [2] | May 1, 1950 |
| National Automobile Transporters Employers Conference | Sept. 1, 1950 |

The Teamsters' policy expired April 30, 1951. The policies on the other groups were renewed continuously until 1957 and thereafter.

---

[2] This group is sometimes referred to in the record as the Automobile Transporters' Welfare Fund or ATWF.

In 1955 and 1956, Associates sold policies similar to those previously described to three additional groups, Stainless Ware Co. of America, Schafer's Detroit Bakery, and City Bank. These latter three groups renewed their policies until 1957 and thereafter. Associates had to make continuing efforts in order to secure renewals of the various policies sold by it.

Continental Assurance Co. of Chicago, Ill., was the insurer under all the policies sold by Associates. All business and commission agreements relating to the five group policies still in effect on November 1, 1957, were on that date transferred to Agency as part of a transaction hereinafter more fully described. Petitioners had no important financial interests in Continental Assurance Co., the insurer under the large group policies sold by Associates, nor in the groups to which such policies were sold.

During the year 1951, Associates redeemed all of its stock except the shares held by Wilson and Wilson, Jr., who each continued to own 50 percent of its outstanding stock until its dissolution in 1957. They also were its principal salesmen. From 1950 through 1957, Associates rented office space and equipment from Agency at 1550 Guardian Building, Detroit.

In April 1953, Associates purchased, as an investment, three shares of Complete Auto Transit, Inc., stock on an installment basis and paid therefor $54,500 in 1953, $7,500 in 1954, and $79,500 in 1955 for a total cost of $141,500. As the result of stock splits or stock dividends, Associates owned 1,200 shares of such stock by 1957.

In 1957, petitioners each owned 50 percent of the stock of two corporations besides Agency and Associates, namely, Ralson Equipment Co., Inc., and Cole & Brown Agency, Inc. Sometime during the summer of 1957 Wilson, then age 74, asked Richard O. Morrison, the treasurer of both Agency and Associates, to study all four companies with a view towards completely liquidating Wilson's interest in them. Morrison did so and, as the result of his study, concluded that the process of liquidating Wilson's interests should begin with Associates. In reaching his conclusion, Morrison was impressed by the fact that Associates had only three principal classes of assets (cash and receivables, stock of Complete Auto Transit, Inc., and insurance commission agreements), all of which could easily be disposed of by sale or by distribution to the shareholders, i.e., petitioners.

Morrison discussed the results of his study with petitioners and with Clarence J. Alandt. Alandt, an attorney and certified public accountant, had acted as independent certified public accountant for petitioners since 1954. The four men agreed upon a plan whereby Associates would (1) transfer its insurance commission agreements and related business, together with an automobile used by Wilson, Jr., to Agency in exchange for cash; (2) collect its notes and accounts

receivable; (3) sell a portion of the Complete Auto Transit stock for cash to Ralph C. Wilson Foundation; (4) distribute its assets, consisting of cash and the balance of the Complete Auto Transit stock, to its shareholders in exchange for its stock; and (5) terminate its corporate existence.

On October 7, 1957, the stockholders of Associates adopted a plan of dissolution. The plan provided that the corporation would try to sell all its assets before December 20, 1957. The articles of incorporation were amended to provide that the corporate existence of Associates would expire on December 31, 1957. From October 7, 1957, until November 1, 1957, Associates continued to conduct its business in the usual manner and made no sales or other dispositions of its assets. As of the close of business October 31, 1957, Associates had the following assets, according to its books of account:

| | |
|---|---:|
| Cash | $9, 220. 22 |
| Accounts receivable | 140, 887. 16 |
| Notes receivable (Wilson, Jr.) | 5, 500. 00 |
| Complete Auto Transit stock | 141, 500. 00 |
| Automobiles | 3, 681. 24 |
| Total assets (book) | 300, 788. 62 |

In addition, Associates had its insurance commission agreements with Continental Assurance Co., which had no cost basis and so were not carried on Associates' books as assets.

On November 1, 1957, Associates and Agency executed a contract whereby all interest of Associates in its insurance commission agreements and in the business represented thereby was transferred to Agency; Agency, in turn, agreed to pay to Associates $75,000 within 30 days. Also, on November 1, 1957, Associates transferred to Agency its 1957 Pontiac automobile for $3,681.14,[3] its book value.

On November 5, 1957, Associates agreed to sell 556 of its 1,200 shares of Complete Auto Transit stock to Ralph C. Wilson Foundation, a Michigan corporation of which petitioners were officers and trustees. Ralph C. Wilson Foundation agreed to pay $129,731.48 for such stock, $37,000 to be paid by November 15, 1957, and the balance of $92,731.48 by April 15, 1958.[4] The cost and tax basis to Associates of the 556 shares of Complete Auto Transit stock was $65,561.67; thus, Associates realized a gain of $64,169.81.

The amendment to Associates' articles of incorporation shortening the corporation's term of existence was filed with the appropriate Michigan agency on December 10, 1957. During November and

---

[3] So stipulated. The 10 cents' discrepancy is unexplained.

[4] Apparently Ralph C. Wilson Foundation paid the balance of the purchase price well in advance, because the parties have stipulated that Associates had, by Dec. 31, 1957, reduced all its assets (except the remaining 644 shares of Complete Auto Transit stock) to cash.

December 1957 Associates collected its receivables and by December 31 had reduced its assets, except for the remaining 644 shares of Complete Auto Transit stock, to cash. Between November 5, 1957, and December 31, 1957, Associates distributed all its assets to petitioners as its only shareholders. Each petitioner received 322 shares of Complete Auto Transit stock (valued by petitioners at $75,887.45) and $100,203.28 cash, or a total distribution of $176,090.73 ($176,090.72 in the case of Wilson, Jr.). Notice to creditors of the dissolution of Associates was published in January 1958. No stock of Agency was issued or distributed in connection with the transactions leading up to the termination of Associates' corporate existence.

During the years 1950-56, Associates received gross income, had net income before taxes, reported Federal income tax liability, paid cash dividends, and had earnings and profits in the amounts set forth in the following schedule:

| Year | Amount and source of gross income | | Income net before taxes | Income tax reported | Cash dividend | Earnings and profits |
|---|---|---|---|---|---|---|
| | Insurance commissions | Dividends | | | | |
| 1950 | $23,052.46 | | $22,687.09 | $5,218.03 | $3,150 | $15,978.51 |
| 1951 [1] | 26,935.90 | | 23,644.43 | 6,797.77 | | 19,525.17 |
| 1952 | 26,745.97 | | 20,461.69 | 6,138.51 | 700 | 33,148.35 |
| 1953 | 33,985.07 | $4,500 | [2] 21,166.44 | 5,202.43 | 1,000 | 48,112.36 |
| 1954 | 30,158.14 | 7,500 | [2] 15,685.39 | 2,793.12 | 1,500 | 59,504.63 |
| 1955 | 40,560.24 | 10,500 | [2] 34,420.65 | 7,757.74 | | [3] 86,112.92 |
| 1956 | 42,713.96 | 9,000 | [2] 34,923.98 | 8,682.47 | | 112,354.43 |

[1] Outsiders' stock redeemed in 1951.
[2] Before deduction of dividends-received credits of $3,825.00 in 1953, $6,375.00 in 1954, $8,925.00 in 1955, and $7,650.00 in 1956.
[3] Includes $49,650.00 of surplus capitalized through a stock dividend.

The dividend income shown in the foregoing table was paid by Complete Auto Transit, Inc. In 1957, Associates earned commissions totaling slightly over $40,000 of which some $35,000 was paid by National Truckaway and Driveaway Conference.

In 1957, Associates employed six persons: Petitioners, Morrison, Robert Sauer, Albert Matteson, and Lorraine Todd. At least three of these persons, Wilson, Jr., Morrison, and Lorraine Todd, were also employed by Agency, and Wilson was chairman of Agency's board of directors. After the dissolution of Associates, Robert Sauer and Albert Matteson were placed on Agency's payroll. Albert Matteson was the brother of Carney Matteson, one of the original incorporators of Associates and the secretary of the National Truckaway and Driveaway Conference (ATWF).

Prior to its acquisition of the commission agreements and business associated therewith from Associates on November 1, 1957, Agency had not sold large group insurance policies. After the acquisition Agency sold or administered large group insurance policies for the

groups formerly handled by Associates. The largest such group, National Truckaway and Driveaway Conference, terminated its insurance coverage in June 1958. No other group terminated its coverage earlier than September 1960. After November 1, 1957, Agency sold large group insurance policies to three or four groups in addition to those for which Associates had acted as selling agent. Agency also acquired some group policies through the purchase of two general insurance agencies, one of which was purchased on November 12, 1957, and the other in 1958. In selling and servicing its newly acquired group policies, Agency could draw on the knowledge and experience of the entire former staff of Associates. Wilson, however, because of his planned retirement, was not expected to give much assistance. By June 1959, he had completely terminated his interests in the four companies previously owned jointly by him and Wilson, Jr. It was expected that Agency would be able to carry on successfully the group insurance business formerly conducted by Associates.

Associates had earnings and profits of $112,354.43 as of January 1, 1957. Its return for the calendar year 1957, which was marked "Final," reported taxable income (before special deductions) of $33,394.32 and a tax liability of $7,417.30. Associates did not include in its taxable income for 1957 any gain in respect of the November 1957 transfers of insurance commission agreements to Agency or Complete Auto Transit stock to Ralph C. Wilson Foundation, consequently, as of October 31, 1957, and before any adjustments on account of such transfers, Associates had earnings and profits of $138,331.45.

Wilson and Wilson, Jr., each had a cost basis of $175 for his stock in Associates; each reported gain on the above-described distributions of $176,090.73 and $176,090.72, respectively, as regards such stock as long-term capital gain. In his statutory notices of deficiency, respondent determined that $138,750.63 of the gain realized by each petitioner on his stock of Associates was taxable as ordinary income, and that only the balance of such gain, or $37,165.10 ($37,165.09 in the case of Wilson, Jr.) was taxable as long-term capital gain.

OPINION

The principal issue is whether the transfer by Associates of certain of its assets to Agency and the subsequent distribution of Associates' remaining assets to petitioners constituted merely a sale of assets followed by a complete liquidation of Associates, as petitioners contend, or a section 368(a)(1)(D)[5] reorganization, as respondent urges.

---

[5] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

   (a) REORGANIZATION.—

      (1) IN GENERAL. * * * the term "reorganization" means—

         *      *      *      *      *      *      *

      (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transferor, or one or more of its shareholders (including

If there was a liquidation, section 331 [6] provides that the distributions to petitioners represented amounts received as full payment in exchange for their stock in Associates. Under this hypothesis, there could be no doubt but that petitioners correctly reported long-term capital gain from the sale of the stock, since the shares were capital assets in the hands of petitioners and were held for more than 6 months. See sec. 1222(3).[7] The distributions to petitioners could, however, be treated as dividends, to the extent provided by section 356(a),[8] if we should conclude that there was a reorganization. If dividend treatment is called for, a further issue is raised as to the amount of Associates' earnings and profits. Respondent contends they amounted to $277,501.26 (or $138,750.63 as to each petitioner) by including as a part of Associates' earnings and profits, the gains on the transfers of the commission contracts ($75,000), and the 566 shares of Complete Auto Transit stock ($64,169.81).

From its inception, Associates had conducted one business, a group insurance business. If Associates had sold its group insurance business to an unrelated corporation and had then liquidated, petitioners undoubtedly would have been entitled to capital gains treatment for the fruits of the enterprise, as well as for the proceeds of the business which produced them. Can they achieve that same treatment despite their continued control over the corporation to which the group insurance business was transferred? We have concluded, for reasons hereinafter set forth at length, that they cannot.

Section 368(a)(1)(D) provides that the term "reorganization" includes a transfer by a corporation of part or all of its assets to another corporation if immediately after the transfer the transferor

persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

\* \* \* \* \* \* \*

(c) CONTROL.—For purposes of part I (other than section 304), part II, and this part, the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

[6] SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS.

(a) GENERAL RULE.—

(1) COMPLETE LIQUIDATIONS.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

(2) PARTIAL LIQUIDATIONS.—Amounts distributed in partial liquidation of a corporation (as defined in section 346) shall be treated as in part or full payment in exchange for the stock.

(b) NONAPPLICATION OF SECTION 301.—Section 301 (relating to effects on shareholder of distributions of property) shall not apply to any distribution of property in partial or complete liquidation.

[7] SEC. 1222. OTHER ITEMS RELATING TO CAPITAL GAINS AND LOSSES.

(3) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.

[8] Sec. 356(a) is set forth in fn. 10, *infra*.

or one or more of its stockholders are in control of the transferee; but there is no reorganization unless stock or securities of the transferee are distributed in a transaction qualifying under section 354, 355, or 356. It is clear from the facts in the instant case that the first part of subparagraph D has been met: there was a transfer by a corporation (Associates) of part of its assets (the insurance commission agreements and related business)[9] to another corporation (Agency), and immediately after the transfer the shareholders of the transferor (petitioners) were in control of the transferee (by virtue of owning all of its stock). The parties disagree, however, as to whether the second part of subparagraph D, requiring a distribution of stock or securities of the transferee in a transaction qualifying under section 354, 355, or 356, has been satisfied. The pertinent provisions of sections 354 and 356—section 355 is not applicable to the factual pattern here presented—are set forth in the footnote.[10]

Petitioners first contend that there can be no reorganization here because no stock or securities of Agency, the transferee, were distributed. Petitioners point out that Agency paid Associates not stock,

[9] The transfer of Associates' automobile to Agency is an unimportant factor here.

[10] SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

(a) GENERAL RULE.—

(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

(2) LIMITATION.—Paragraph (1) shall not apply if—

(A) the principal amount of any such securities received exceeds the principal amount of any such securities surrendered, or

(B) any such securities are received and no such securities are surrendered.

(3) CROSS REFERENCE.—

For treatment of the exchange if any property is received which is not permitted to be received under this subsection (including an excess principal amount of securities received over securities surrendered), see section 356.

(b) EXCEPTION.—

(1) IN GENERAL.—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless—

(A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and

(B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.

SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.

(a) GAIN ON EXCHANGES.—

(1) RECOGNITION OF GAIN.—If—

(A) section 354 or 355 would apply to an exchange but for the fact that

(B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money,

then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

(2) TREATMENT AS DIVIDEND.—If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property.

but $75,000 cash (which we may assume to have been fair market value) for the group insurance commission agreements and business transferred. Petitioners recognize that we rejected almost identical arguments made by the petitioners in *James Armour, Inc.*, 43 T.C. 295 (1964), and *South Texas Rice Warehouse Co.*, 43 T.C. 540 (1965), on appeal (C.A. 5, June 7, 1965); but they urge that those cases were incorrectly decided and should be reconsidered. Specifically, petitioners argue that in relying upon *Commissioner* v. *Morgan*, 288 F. 2d 676 (C.A. 3), certiorari denied 368 U.S. 836 (1961), decided under the 1939 Code, we did not give proper weight to the 1954 addition of the final clause of section 368(a)(1)(D) to the language of former section 112(g)(1)(D) of the 1939 Code.[11] The 1954 Code, claim petitioners, requires an actual distribution of stock or securities.

We do not interpret the legislative history of section 368(a)(1)(D) in the same manner as do petitioners. An intelligent evaluation of the changes in prior law intended by that section cannot be made by focusing attention on one provision and ignoring all related areas. We have examined the committee reports accompanying the reorganization provisions of the 1954 Code, particularly those portions of the reports regarding sections 354, 355, 356, and 368.[12] The final clause of section 368(a)(1)(D) was apparently added as an element of a statutory scheme designed to ensure that corporate divisions—spin-offs, split-offs, and split-ups—would have to satisfy the requirements of section 355 before qualifying as reorganizations.[13] See Bittker, Federal Income Taxation of Corporations & Shareholders 352–353 (1959); Lane "The Reincorporation Game: Have the Ground Rules Really Changed?", 77 Harv. L. Rev. 1218, 1245–1247, 1249–1255 (1964); 3 Mertens, Law of Federal Income Taxation, sec. 20.64, pp. 248–249 (1965 rev.). Consequently, the proviso in section 368(a)(1)(D) that the described transfers are included in the definition of a reorganiza-

---

[11] SEC. 112. RECOGNITION OF GAIN OR LOSS.

　(g) DEFINITION OF REORGANIZATION.— * * *

　　(1) The term "reorganization" means * * * (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred, * * *

[12] S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., pp. 41–42, 50–52, 263–64, 265–69, 272–75 (1954); H. Rept. No. 2543, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., pp. 34, 37–38, 41 (1954).

[13] The terms are defined in Jacobs, "Spin-Offs: The Pre-Distribution Two Business Rule—Edmund P. Coady and Beyond," 19 Tax L. Rev. 155, fn. 2 (1964), and in Bittker, Federal Income Taxation of Corporations and Shareholders 322 (1959).

The tax avoidance sought to be prevented by the enactment of sec. 355 was the transformation of what was essentially a dividend into capital gains by use of the following basic pattern: A corporation would transfer part of its assets to B corporation for all of B's stock; B's stock would be distributed to A's shareholders, perhaps in partial redemption of their A stock; thereafter, B would be liquidated or its stock sold to third parties. If the plan was successful, no gain would be recognized on the distribution of B's stock, and only capital gain on the liquidation of B or the sale of its stock. See Remarks of Senator Humphrey relative to what became sec. 317(a), Revenue Act of 1951, 96 Cong. Rec. 13685 (1950), quoted in Jacobs, *supra*, fn. 18, at 160–161.

tion "only if * * * stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356" should not be viewed as imposing any condition other than qualification under the designated sections.

Moreover, we see no reason to construe the disputed language of section 368(a)(1)(D) any differently from the similar language of section 112(b)(3) of the 1939 Code, dealt with in *Commissioner* v. *Morgan, supra,* or section 354(a), considered in *James Armour, Inc., supra.*[14] In *Armour,* we held that there was a reorganization within the meaning of section 368(a)(1)(D) even though no stock of the transferee corporation was issued either to the transferor corporation or its shareholders. Our holding was based on the reasoning that, since the taxpayers already owned all the stock of the transferee, "it was not necessary that further stock be issued in order that they might retain their same proprietary interest in the assets * * * [which were transferred]. The issuance of further stock would have been a meaningless gesture, and we cannot conclude that the statute requires such a vain act." *James Armour, Inc., supra* at 307. Accord, *South Texas Rice Warehouse Co., supra.*

Petitioners herein argue, as did the petitioners in *Armour* and *South Texas Rice,* that a distinction should be drawn between cases like *Morgan,* where the transferee corporation receives some assets without consideration, and cases like *Armour* and the instant case, where the transferee pays fair market value for what it receives. In rejecting such a distinction in *Armour,* we held the correct rule to be the following:

the exchange requirements [of the statute] are met if, when a series of transactions is completed, the stockholders of the old corporation retain their proprietary interest in the same going business, although in another corporate shell. * * * [43 T.C. at 308]

That rule is applicable here, and we follow it. The record clearly shows that petitioners retained their proprietary interest in Associates' "going business," its group insurance business, in Agency's corporate shell. Consequently, we hold that the exchange requirements of sections 354(a) and 356(a) and the distribution requirement of section 368(a)(1)(D) are satisfied.[15]

---

[14] Sec. 368(a)(1)(D) uses the language: "if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are *distributed* in a transaction which qualifies under section 354, 355, or 356." (Emphasis supplied.)

Sec. 112(b)(3) of the 1939 Code and sec. 354(a) contain the following: "if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, *exchanged* solely for stock or securities in such corporation or in another corporation a party to the reorganization." (Emphasis supplied.)

The need for stock or securities to be physically handed out when they are "distributed" would seem to be neither greater nor lesser than when they are "exchanged."

[15] Petitioners suggest that, were the positions of the parties reversed, with petitioners seeking reorganization treatment, our conclusion might be otherwise. We reject this suggestion.

Petitioners' claim that there was no plan of reorganization is easily disposed of. The plan of dissolution adopted by Associates' shareholders on October 7, 1957, provided that the corporation's assets would, to the extent possible, be liquidated before December 20, 1957. It is clear from the testimony of Morrison that no serious thought was given to transferring the group insurance business to any party other than Agency. That the word "reorganization" was not used by the stockholders or directors is immaterial. It is sufficient that the various steps were taken pursuant to the plan agreed upon by petitioners and their advisers. We hold that there was a plan of reorganization within the meaning of sections 354(a) and 368(a)·(1)(D). Cf. *Ethel K. Lesser*, 26 T.C. 306 (1956).

Petitioners next contend that the transactions in question did not qualify under section 354 or 356 because less than "substantially all" of Associates' assets were transferred to Agency. This argument, based as it is primarily on percentages, cannot withstand scrutiny in the light of recent cases of this Court.

In *John G. Moffatt*, 42 T.C. 558 (1964), on appeal (C.A. 9, Sept. 28, 1964), we had to determine whether certain transactions amounted to a transfer of "substantially all of the assets" of a corporation, within the meaning of section 354(b)(1)(A), the section herein involved. We there admonished: "it must be remembered that the 'substantially all' requirement 'has been subjected to [a] construction which in effect applies a continuity test rather than mere blind percentages.'" 42 T.C. at 578. In the course of holding that section 354(b)(1)(A) had been satisfied, we noted that the transferee "finally wound up with all the assets that were necessary or appropriate to the conduct of the [transferor's] business." 43 T.C. at 579.

In *James Armour, Inc., supra*, we again had occasion to consider the meaning of the term "substantially all" as used in section 354(b)(1)(A). After summarizing the transfers which had been made, we stated (43 T.C. at 309):

Thus, it will be seen that as a result of the transactions Excavating either acquired title to, or the use of, all the assets essential to the conduct of the business enterprise. It seems clear that the assets which it did not acquire, namely, cash and accounts receivable, were not necessary to the conduct of the enterprise. If such unneeded assets had been distributed to the petitioners prior to the transfer of the essential assets to Excavating there clearly would be no question that substantially all of Armour, Inc.'s assets were acquired by Excavating. As pointed out in *Commissioner* v. *First National Bank of Altoona, supra*, the date of distribution is not decisive in such a situation as is here presented. Accordingly, we conclude that substantially all of the assets of Armour, Inc., were acquired by Excavating within the contemplation of section 354(b)(1)(A) of the Code.

It is perfectly clear, in the instant case, that all the assets that were necessary or appropriate to the conduct of the business of Associates

were transferred to Agency. These assets consisted of the group insurance commission agreements and related business, which were transferred by contract dated November 1, 1957. Significantly, after the transfer all of the former employees of Associates, with the possible exception of Wilson,[16] were employed by Agency, so that Agency obtained the services of Associates' experienced personnel. Compare *John G. Moffatt, supra* at 579. Also transferred to Agency was an automobile, the only tangible property owned by Associates. The latter transfer is of limited importance, but it illustrates how completely Agency took over the businesss assets of Associates.

That all of the assets needed in the conduct of Associates' business were transferred to Agency can also be shown by an examination of the assets *not* transferred. These consisted entirely of cash, receivables (including notes receivable from Wilson, Jr.), and investment stock. As in *Armour*, the assets not acquired by Agency "were not necessary to the conduct of the enterprise." If they had been distributed to petitioners prior to the transfer to Agency of the essential assets, the latter transfer could easily have been seen as a transfer of "substantially all of the assets" of Associates. See *James Armour, Inc., supra* at 309.[17] Instead, the distribution to petitioners was made after the transfer to Agency. The rule that the words of a statute

---

[16] The record does not disclose whether Wilson engaged in any sales efforts on behalf of Agency after the transfer to it of Associates' group insurance business. By June 1959 Wilson had disassociated himself from Agency. Petitioners contend that Wilson's sales efforts were very important to the retention of the group insurance business, so that his planned retirement prevented the transfer of a going business from Associates to Agency. We reject this contention as lacking sufficient foundation in the evidence. The retention of the group insurance business was not shown to have been largely dependent upon Wilson's salesmanship or contacts. Similarly, the termination of coverage, between 1958 and 1963, by four of the five accounts originally sold by Associates was not shown to be linked to Wilson's retirement. Furthermore, Agency had not only retained one of the original group accounts until the time of trial, but had also added three or four new accounts, thereby indicating its ability to conduct a successful group insurance agency business without Wilson.

[17] Petitioners cite *Richard K. Mellon,* 12 T.C. 90 (1949), other issues affirmed 184 F. 2d 157 (C.A. 3, 1950), as holding that a preliminary distribution of assets will prevent the transfer of the remaining assets from meeting the "substantially all" requirement. In that case the preliminary distribution was to a newly created subsidiary corporation, the stock of which was distributed pro rata to the transferor's stockholders. However, in *Helvering* v. *Elkhorn Coal Co.,* 95 F. 2d 732 (C.A. 4, 1937), certiorari denied 305 U.S. 605 (1938), relied upon by the Court in *Richard K. Mellon,* the preliminary transfer of assets to a new corporation was expressly distinguished from a distribution *directly* to the transferor's stockholders, thereby taking the assets out of corporate solution. The Court of Appeals implied that a distribution of the latter type would not prevent the subsequent transfer of the remaining assets from meeting the "substantially all" requirement by the following language:

"It is suggested in the opinion of the Board that the case before us is analogous to that which would have been presented if the old company, prior to the transfer to Mill Creek, had distributed to its stockholders all of the assets except those destined for such transfer; but the distinction is obvious. In the case supposed, the business enterprise would have definitely divested itself of the property distributed. Here it did not divest itself of the property at all, but merely made certain changes in the legal papers under which it enjoyed corporate existence. No rule is better settled than that in tax matters we must look to substance and not to form; and no one who looks to substance can see in the mere change of charters, which is all that we have here, any reason for permitting

should, where possible, be given their ordinary meaning—see, e.g., *Malat* v. *Riddell*, 382 U.S. 900 (1966)—is not inconsistent with the evaluation of transactions by reference to their overall effects rather than to the form given by the parties to the component parts thereof. See *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609 (1938). As we stated in *Armour*, the date of distribution should not, under such circumstances as are here present, be decisive.[18]

Petitioners rely upon *Pillar Rock Packing Co.* v. *Commissioner*, 90 F. 2d 949 (C.A. 9, 1937). In that case, a corporation transferred all of its assets except an account receivable to a second corporation in exchange for cash, notes, and preferred stock. The account receivable constituted 32 percent of the total value of the transferor's assets. In holding that there was no reorganization within section 112(i)(1)(A) of the Revenue Act of 1928,[19] the court rejected the taxpayer's argument that "substantially all the properties" referred only to operating properties. Petitioners argue that the phrase "substantially all of the assets" used in section 354(b)(1)(A) is at least as broad as, if not broader than, the language at issue in *Pillar Rock Packing Co.*, "substantially all the properties."

We may assume that "substantially all the properties" used in one reorganization provision is to be given the same interpretation as "substantially all of the assets" used in another such provision. We think, nevertheless, that *Pillar Rock Packing Co.* is distinguishable [20] from the instant case, and from *Moffat* and *Armour*, because the account receivable not acquired by the transferee there does not appear to have been distributed to the transferor's stockholders and transferor appears to have continued in existence for about 2 years. See *Milton Smith*, 34 B.T.A. 702, 705–706 (1936). *Richard K. Mellon*, 12 T.C. 90 (1949), other issues affirmed 184 F. 2d 157 (C.A. 3, 1950), also relied

a transfer of a part of the corporate assets to escape the taxation to which it is subject under the statute.

"Congress has seen fit to grant nonrecognition of profit in sale or exchange of assets only under certain conditions, one of which is that one corporation shall transfer "substantially all" of its properties for stock in another. If nonrecognition of profit can be secured by the plan adopted in this case, the exemption is broadened to cover all transfers of assets for stock, whether "substantially all" or not, if only the transferor will go to the slight trouble and expense of getting a new charter for his corporation and making the transfer of assets to the new corporation thus created in such way as to leave in the old only the assets to be transferred at the time the transfer is to be made. We do not think the statutory exemption may be thus broadened by such an artifice."

[18] There being no evidence to indicate that a distribution to petitioners of all the assets not transferred to Agency would have required Associates to curtail its group insurance business in any degree, such a distribution would not have been treated as a partial liquidation. See sec. 1.346–1(a), Income Tax Regs.; S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 261–262; Bittker, *supra* at 216–219.

[19] 45 Stat. 791, 818: "The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of * * * substantially all the properties of another corporation) * * *."

The foregoing provision is similar to sec. 368(a)(1)(C) of the 1954 Code.

[20] Even if we considered *Pillar Rock Packing Co.* or *Richard K. Mellon* to be inconsistent with *Moffatt* and *Armour*, we would nevertheless follow the latter, more recent decisions.

upon by petitioners, is similarly distinguishable [20] from the case before us. (See fn. 17, *supra*.)

The distribution to petitioners of the nonessential liquid and investment assets of Associates was part of the same plan which contemplated the transfer of the group insurance business to Agency. We hold, in reliance upon *Moffatt* and *Armour*, both *supra*, that the delay in the distribution until after the transfer did not prevent the acquisition by Agency of "substantially all of the assets" of Associates, within the intendment of section 354(b)(1)(A).

The foregoing conclusion is supported not only by authority, but also by an examination of the legislative history of sections 354(b)(1) and 368(a)(1)(D). The pattern employed by the petitioners herein is, in effect, a variation of the "liquidation-reincorporation" technique, "a device whereby it has been attempted to withdraw corporate earnings at capital gains rates by distributing all the assets of a corporation in complete liquidation and promptly reincorporating the business assets." See H. Rept. No. 2543, 83d Cong., 2d Sess., p. 41 (cited in fn. 12, *supra*).[21] If successful, such a pattern enables the stockholders of a corporation to withdraw its earnings and profits in the form of liquid or investment or other nonessential assets, to continue in the same relationship to "the business," and to avoid tax at ordinary income rates on what is essentially a dividend.

It was usually held, under the 1939 Code, that the various steps of a liquidation-reincorporation constituted a reorganization within section 112(g)(1)(D), and that the assets retained by the shareholders were to be treated as dividends to the extent provided by section 112(c)(2), now section 356(a)(2). See, e.g., *Becher* v. *Commissioner*, 221 F. 2d 252 (C.A. 2, 1955), affirming 22 T.C. 932 (1954); *Pebble Springs Distilled Co.*, 23 T.C. 196 (1954), affd. 231 F. 2d 288 (C.A. 7), certiorari denied 352 U.S. 836 (1956); *William M. Liddon*, 22 T.C. 1220 (1954), this issue affirmed 230 F. 2d 304 (C.A. 6), certiorari denied 352 U.S. 824 (1956). While it is true that sections 354(b)(1) and 368(a)(1)(D) made certain changes in prior law, these changes, as previously noted, were intended to curtail the transformation of dividend income into capital gains through the abuse of divisive reorganizations—spin-offs, split-offs, and split-ups. It would be an anomalous perversion of the intent of Congress to interpret such changes as licensing the same kind of tax avoidance through a different, previously closed route.[22]

---

[21] The instant case differs from the classical model only in that the business assets were first transferred to an existing controlled corporation and then the liquid and investment assets were distributed to the stockholders.

[22] See H. Rept. No. 2543, *supra* at 41:

"(1) *Liquidation followed by reincorporation.*—The House bill in section 357 contained a provision dealing with a device whereby it has been attempted to withdraw corporate earnings at capital gains rates by distributing all the assets of a corporation in complete liquidation and promptly reincorporating the business assets. This provision gave rise

Having determined that a reorganization took place, we must now decide whether the distributions of cash and investment stock from Associates to petitioners had "the effect of the distribution of a dividend," within the meaning of section 356(a)(2).[23] Petitioners apparently do not dispute that, if there was a reorganization, the distributions to Wilson, Jr., had the effect of a dividend; and in view of his continued equity interest in the business previously carried on by Associates, we are satisfied that the distributions to him had such effect.[24] As to Wilson, however, petitioners argue that the distributions to him were part of a plan for his complete withdrawal from the business of both Associates and Agency and, as such, should be taxed as capital gains. Petitioners cite no cases on this issue. Respondent's position is that the distributions to both petitioners had the effect of dividends; as authority for his position he cites *Commissioner* v. *Estate of Bedford*, 325 U.S. 283 (1945), and *Ethel K. Lesser*, 26 T.C. 306, 314.

Whether the distributions to Wilson had the effect of dividends depends upon all the facts and circumstances surrounding the distributions. *Ross* v. *United States*, 147 Ct. Cl. 661, 173 F. Supp. 793, certiorari denied 361 U.S. 875 (1959); *Idaho Power Co.* v. *United States*, 142 Ct. Cl. 534, 161 F. Supp. 807, certiorari denied 358 U.S. 832 (1958); cf. *William H. Bateman*, 40 T.C. 408 (1963). Of course, petitioners have the burden of proving the distributions did not have the effect of dividends. Rule 32, Tax Court Rules of Practice.

The fact that Wilson disposed of his Agency stock within 18 months or so after the distributions from Associates would not, in itself, support a finding that the distributions did not have the effects of dividends. Can the additional fact that the distributions were part of a nebulous plan for Wilson, some time in the future, to retire from the various enterprises he and his son had theretofore owned jointly

---

to certain technical problems and it has not been retained in the bill as recommended by the accompanying conference report. It is the belief of the managers on the part of the House that, at the present time, the possibility of tax avoidance in this area is not sufficiently serious to require a special statutory provision. It is believed that this possibility can appropriately be disposed of by judicial decision or by regulation within the framework of the other provisions of the bill."

[23] SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.

   (a) GAIN ON EXCHANGES.—

      (1) RECOGNITION OF GAIN.—If—

         (A) section 354 or 355 would apply to an exchange but for the fact that

         (B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money,

then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

      (2) TREATMENT AS DIVIDEND.—If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property.

[24] See fn. 18, *supra*.

suffice to carry petitioners' burden of proof on this matter? Because of the absence of evidence about the details of Wilson's ultimate withdrawal from the business and about the precise relationship of the distributions in question to the manner of such withdrawal, the answer to the foregoing question must be in the negative.

Immediately after the distributions, Wilson still owned a 50-percent equity interest in the group insurance business by virtue of his stockholdings in Agency. At this point in time, he stood on the same footing as Wilson, Jr. It does not appear that the petitioners had agreed upon any definite date by which Wilson was to retire, or that completion of his retirement by June 1959, instead of by June 1960 or later, was contemplated at the time of the distributions in question. We do not know whether Wilson's stock in Agency was redeemed, sold, or given away. The record does not even show the ownership of Agency's stock between June 1959 and March 1965, at which latter time it is stipulated that Wilson, Jr., owned all of Agency's stock. In short, petitioners have not shown a sufficient relationship between the payments in question and Wilson's ultimate withdrawal from Agency to establish that the payments to Wilson did not have the effect of distributions of dividends.[25] Since they have failed to carry their burden of proof, they cannot prevail. Thus, both petitioners must be treated as having received dividends to the extent provided by section 356(a)(2). Cf. *James Armour, Inc., supra* at 310.

Section 356(a)(2), as applicable to the facts herein, provides that the distributions to petitioners shall be treated as dividends to the extent of Associates' earnings and profits accumulated after February 28, 1913; the balance of the distributions, less petitioners' basis in their stock, is treated as capital gain. See *James Armour, Inc., supra* at 310. The parties have stipulated that Associates had earnings and profits of $138,331.45 before giving any effect to the transfer of assets to Agency or the sale of Complete Auto Transit stock to the Ralph C. Wilson Foundation. Respondent originally determined that both such transactions increased the earnings and profits of Associates; he now contends only that the latter, the sale of Complete Auto Transit

---

[25] Looking upon Associates and Agency (in light of the reorganization) as one enterprise, we could not say, without additional evidence, that a large distribution to the controlling shareholders prior to the withdrawal of one of them was not a dividend to the withdrawing shareholder. Even if it were clear, as it certainly is not on the record before us, that part of Wilson's stock was redeemed, it is doubtful whether the evidence would support a finding that the redemption was not "essentially equivalent to a dividend" under sec. 302(b)(1). See *Ross* v. *United States*, 147 Ct. Cl. 661, 173 F. Supp. 793, certiorari denied 361 U.S. 875 (1959); (secs. 302(b),(1) and 356(a)(2) are in pari materia). Compare *Thomas G. Lewis*, 35 T.C. 71 (1960), with *Estate of Arthur H. Squier*, 35 T.C. 950 (1961) (effect of attribution of ownership rules of sec. 318 on determinations under sec. 302(b)(1)).

For a general discussion of the problems encountered in the application of sec. 356(a)(2), see Shoulson, "Boot Taxation: The Blunt Toe of the Automatic Rule," 20 Tax L. Rev. 573 (1965).

stock had such an effect.[26] Petitioners deny that the earnings and profits exceeded the stipulated amount. The relevant portions of section 312 and the regulations thereunder are set forth in the footnote.[27]

In its return for the calendar year 1957, Associates disclosed the sale of 566 shares of Complete Auto Transit, Inc., stock, at a price of $233.33 per share and the total selling price of $129,731.48. It did not, however, report any taxable income from the transaction, presumably on the theory that the sale was within the ambit of section 337.[28] Respondent's theory though not completely spelled out, appears to be that section 337 was not applicable because there was no complete liquidation of Associates, the purported liquidation having constituted merely a step in the reorganization. See *James Armour, Inc.*, *supra*. Thus, the gain on the sale of stock ($64,169.81) should have been reported by Associates as taxable income and the earnings and profits should be increased by the amount of the gain.

Petitioners emphasize that Associates did not report the gain from the sale of stock as taxable income on its 1957 return. According to petitioners, this means that the gain was not in fact "recognized" within the intendment of section 312(f)(1), even if it might have been recognizable and should have been recognized. Petitioners cite no cases in support of this contention.

We reject petitioners' interpretation of the statute as unsound. Section 312(f)(1) provides, in pertinent part, that the gain realized from the sale of property by a corporation shall increase it earnings

---

[26] The reason for respondent's concession as to the $75,000 gain on the transfer of the insurance commission agreements is not made clear. We assume it is because of the nonrecognition provisions of sec. 361(b)(1)(A) which seem clearly applicable.

[27] SEC. 312. EFFECT ON EARNINGS AND PROFITS.

(f) EFFECT ON EARNINGS AND PROFITS OF GAIN OR LOSS AND OF RECEIPT OF TAX-FREE DISTRIBUTIONS.—

(1) Effect on earnings and profits of gain or loss.—The gain or loss realized from the sale or other disposition (after February 28, 1913) of property by a corporation—

\* \* \* \* \* \* \*

shall increase or decrease the earnings and profits to, but not beyond, the extent to which such a realized gain or loss was recognized in computing taxable income under the law applicable to the year in which such sale or disposition was made. \* \* \*

Sec. 1.312-6. Earnings and profits.

(b) Among the items entering into the computation of corporate earnings and profits for a particular period are all income exempted by statute, income not taxable by the Federal Government under the Constitution, as well as all items includible in gross income under section 61 or corresponding provisions of prior revenue acts. Gains and losses within the purview of section 1002 or corresponding provisions of prior revenue acts are brought into the earnings and profits at the time and to the extent such gains and losses are recognized under that section. \* \* \*

[28] SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.

(a) GENERAL RULE.—If—

(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

and profits to the extent to which the gain "was recognized in computing taxable income *under the law applicable to the year in which such sale \* \* \* was made.*" (Emphasis supplied.) The italicized language, which petitioners apparently ignore, indicates to us the intention of Congress that earnings and profits should be computed with reference to the correct tax treatment of transactions, regardless of how they may in fact have been treated. Our decision in *Lou Levy*, 30 T.C. 1315 (1958), directly supports such an interpretation. In that case, a corporation had erroneously included certain royalty payments in its taxable income. We held that the corporation's earnings and profits should be adjusted so as to eliminate any increase resulting from the erroneous inclusions in income. Finally, the regulations provide that "all items *includible* in gross income under section 61" enter into the computation of earnings and profits. (Emphasis supplied.) Sec. 1.312–6(b), Income Tax Regs.

Petitioners apparently concede that section 337 is inapplicable where the purported liquidation was merely a step in a reorganization. We have already held that section 356(a), rather than section 331, applies to the distributions from Associates to petitioners. Compare *James Armour, Inc., supra.* See sec. 1.331–1(c), Income Tax Regs. We now hold that section 337(a), like section 331, is inapplicable, since there was no "complete liquidation" of Associates. Cf. *South Texas Rice Warehouse Co., supra* at 568. See Bromberg, "Pitfalls in Corporate Liquidations," 44 Taxes 174, 181–82 (Mar. 1966). It follows, then, that the earnings and profits of Associates were increased by $64,169.81, the gain realized on the sale of the 566 shares of Complete Auto Transit stock.

To reflect concessions of both parties,

*Decisions will be entered under Rule 50.*