614 F.2d 860
 80-1 USTC P 9177
 ATLAS TOOL CO., INC., Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent (Tax Court
Docket No. 7633-74).
ATLAS TOOL CO., INC., Successor to Fletcher Plastics, Inc., Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent (Tax Court
Docket No. 7634-74).
Stephan SCHAFFAN and Mildred Schaffan, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent (Tax Court
Docket No. 7635-74).
Appeal of ATLAS TOOL CO., INC., Atlas Tool Co., Inc.,
Successor to Fletcher Plastics, Inc., Stephan
Schaffan and Mildred Schaffan, Appellants.
ATLAS TOOL CO., INC., Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent (Tax Court
Docket No. 7633-74).
ATLAS TOOL CO., INC., Successor to Fletcher Plastics, Inc., Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent (Tax Court
Docket No. 7634-74).
Stephan SCHAFFAN and Mildred Schaffan, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent (Tax Court
Docket No. 7635-74).
Appeal of COMMISSIONER OF INTERNAL REVENUE, Appellant.
 Nos. 78-2631, 78-2632.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 15, 1979.
Decided Jan. 28, 1980.
As Amended Jan. 31, 1980.
 
 John J. O'Toole (argued), Starr, Weinberg & Fradkin, Newark, N. J., for appellants in 78-2631.
 M. Carr Ferguson, Asst. Attys. Gen., Gilbert E. Andrews, Ernest J. Brown, James A. Riedy (argued), Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellant in 78-2632.
 Before GIBBONS and HIGGINBOTHAM, Circuit Judges and WEINER, District Judge.*
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 This case presents cross-appeals from decisions of the United States Tax Court upholding, in consolidated cases, a deficiency in federal income tax asserted for the taxable year 1970 against Stephan and Mildred Schaffan, a deficiency in accumulated earnings tax against Atlas Tool Co., Inc. (Atlas) for the fiscal years ending June 30, 1969 and 1970, and transferee liability of Atlas for conceded deficiencies in accumulated earnings taxes of Fletcher Plastics, Inc. (Fletcher) for the fiscal years ending November 30, 1968, 1969 and 1970.[1] Stephan Schaffan is the sole stockholder of Atlas, a New Jersey corporation still in existence, and of Fletcher, also a New Jersey corporation, which was dissolved in 1970. The deficiency assessed against the Schaffans involves the tax treatment of over $400,000 in cash distributed to Schaffan upon the dissolution of Fletcher. The Schaffans reported this distribution as a long-term capital gain but the Commissioner of Internal Revenue and the Tax Court treated it as a dividend, taxable as ordinary income. The individual taxpayers contend that the distribution from Fletcher qualified for capital gains treatment, while the Commissioner urges that the Tax Court erred in calculating the amount of the dividend, and that a higher tax is due. Atlas contends that the Tax Court erred in upholding the accumulated earnings tax assessed against it, and in imposing transferee liability on it for Fletcher's tax obligations. We affirm the Tax Court in all respects.
 
 I. The Schaffan's Individual Tax Liability
 
 2
 In October 1970, Schaffan owned all the stock of Atlas and of Fletcher. Atlas was then engaged in the business of designing and selling products for the hobby industry, principally model railroads. Prior to 1960, Atlas also manufactured such products. In 1960, Fletcher was incorporated, acquired Atlas' plastic molding machines, and thereafter, conducted the manufacturing operations previously conducted by Atlas. Fletcher occupied one floor of a building, the balance of which was occupied by Atlas. Atlas was virtually the only customer of Fletcher.
 
 
 3
 During the 1960's, Atlas continually increased its purchase of foreign manufactured components, which were cheaper than those domestically manufactured. Eventually, Schaffan decided that the manufacturing operations being performed by Fletcher were no longer essential since the same quality components could be acquired at a lower cost from foreign sources. Accordingly, in October 1970, at the directors' and stockholders' meetings, it was voted that Fletcher liquidate in the manner permitted by section 337, 26 U.S.C. § 337 (1976).
 
 
 4
 On November 5, 1970, Fletcher transferred to Atlas all its machinery and equipment for an appraised price of $100,250, and all its inventory for its $14,600 cost. Fletcher's only accounts receivable were from Atlas, and these were paid in full. On November 19, 1970, Schaffan received from Fletcher a cash distribution of $482,246.82 which represented all of its remaining assets. Fletcher filed an appropriate Form 966 with the District Director of its intended section 337 liquidation, and filed final federal and state tax returns for the fiscal year ending November 30, 1970. Fletcher was formally dissolved in June 1971.
 
 
 5
 The machinery and equipment transferred to Atlas remained in place in the building otherwise occupied by Atlas. Fletcher's former employees were employed by Atlas, initially in its packing and shipping departments. The machinery and equipment, left in place, was idle for a time. However, by December 1970, Atlas began experiencing delivery and quality difficulties with its foreign suppliers, and to keep its inventory adequate, it soon started operating some of the Fletcher machines. By the end of 1971, all the machinery and equipment acquired from Fletcher were in operation.
 
 
 6
 On the Schaffan's 1970 federal income tax return they reported $400,000 as a distribution from Fletcher in complete liquidation under section 331, which provides that "(a)mounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for stock." 26 U.S.C. § 331 (1976). They claimed an adjusted basis of $10,000 for the Fletcher stock, and paid tax on a long-term capital gain of.$390,000. In the notice of deficiency, the Commissioner asserted that the amount distributed to Schaffan was actually $482,246.82 (an amount not contested by the taxpayer) and that the transaction was not a section 331-337 liquidation, but a reorganization within the meaning of 26 U.S.C. § 368(a)(1)(D). Section 368(a)(1)(D) provides that:
 
 
 7
 a transfer by a corporation of all or a part of its assets to another corporation (is a reorganization) if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356; . . . .
 
 
 8
 26 U.S.C. § 368(a)(1)(D) (1976). Whether the transaction is characterized as a section 368(a)(1)(D) reorganization or a section 337 liquidation, there is still no gain or loss recognized to Fletcher on the transfer of its machinery and equipment to Atlas. But if the transaction was a reorganization, the distribution by Fletcher to Schaffan would be covered by the "boot" provision of section 356, 26 U.S.C. § 356 (1976), and thus be treated as ordinary income rather than as a capital gain pursuant to section 331, 26 U.S.C. § 331(a) (1976).
 
 
 9
 Section 356(a)(2) provides that money distributed to stockholders in a reorganization shall, to the extent of the stockholders' gain, be treated as a dividend out of earnings and profits of "the corporation." 26 U.S.C. § 356(a)(2) (1976). The Commissioner contends that when, as here, there is complete identity of shareholders in the two corporate parties to a D reorganization, the earnings and profits of both corporations should be taken into account to determine how much of the cash distributed by either is the equivalent of a dividend. The combined earnings and profits of Fletcher and Atlas exceeded $5 million, and thus the Commissioner proposes to treat the entire $482,246.82, less Schaffan's $10,000 basis for his Fletcher stock, as a section 356(a)(2) dividend.[2]
 
 
 10
 The Tax Court held that the transaction was a D reorganization, and therefore section 356(a)(2) applied, but that the dividend treatment was authorized only to the extent of earnings and profits of Fletcher. It computed those earnings and profits as $440,342.56, and determined that the difference between that sum and $472,246.82 was taxable as a long-term capital gain. The Schaffans contend that the entire $472,262.82 was a long-term capital gain. The Commissioner contends it was all a section 356(a)(2) dividend.
 
 
 11
 We turn first to the Schaffan's contention. They point to the adoption by appropriate corporate resolution of a plan of complete liquidation of Fletcher within twelve months, to the accomplishment of both the disposition and distribution of Fletcher's assets within that time, and to Fletcher's dissolution. These events, they urge, were in full compliance with section 337, which provides for the nonrecognition of gain or loss on the sale of Fletcher's machinery and equipment to Atlas. Moreover, they argue that the distribution is "in complete liquidation" of Fletcher and should, therefore, "be treated as in full payment in exchange for (Fletcher) stock" pursuant to section 331, 26 U.S.C. § 331(a)(1) (1976). Taxpayers contend that in the absence of any proof of an intent to avoid taxes, it was error for the Tax Court to characterize the transaction as a D reorganization instead of a complete liquidation.
 
 
 12
 Our starting point is the text of section 368(a)(1)(D) quoted above. Clearly there was, as that section requires, a transfer by Fletcher of all or part of its assets in this case all its machinery, equipment and inventory were transferred to another corporation, Atlas. In addition, Schaffan, the sole stockholder of Fletcher, was in control of Atlas "immediately after" the transfer. No stock or securities of Atlas were distributed to Schaffan. But despite the language in section 368(a)(1)(D) to that effect, it has been held that a distribution is not necessary where the ownership of the transferor and transferee is identical because such a distribution would be a mere formality.[3]
 
 
 13
 A distribution pursuant to section 368(a)(1)(D) must also qualify under section 354 or section 355 in order for section 356 to be applicable. Section 355, which concerns the distribution of stock and securities of a controlled corporation, does not come into play in the Fletcher-Atlas transaction. Section 354, however, is applicable to the facts in this case. It provides for the nonrecognition of gain or loss on an exchange of stock or securities solely for stock or securities. Where there is complete identity of ownership, section 354, like section 368(a)(1)(D), has been construed not to require the meaningless formality of such an exchange.[4] However, section 354(a):
 
 
 14
 shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless
 
 
 15
 (A) the corporation to (Atlas) which the (Fletcher) assets are transferred acquires substantially all of the assets of the transferor of such assets . . . .
 
 
 16
 26 U.S.C. § 354(b)(1)(A). The "substantially all" requirement is chiefly determined by focusing on the transfer of the operating assets by the transferor, and not on the unneeded liquid assets such as cash and accounts receivable.[5] In light of the facts that all of Fletcher's assets except cash and accounts receivable went to Atlas, that Atlas had hired all of Fletcher's employees, that the operating assets never changed location, and were utilized within four months to manufacture the same products, we conclude that the "substantially all" assets requirement of section 354(b)(1)(A) was satisfied.
 
 
 17
 Section 354(b)(1)(B) requires, as well, that the distribution of securities in a D reorganization be "in pursuance of a plan of reorganization." The transfer was certainly a part of an overall plan. The controlling shareholder chose to call the transaction a plan of liquidation. If what resulted was a plan of reorganization, the chosen label is not dispositive.[6]
 
 
 18
 We conclude, as did the Tax Court, that the transaction which resulted in Fletcher's distribution of $482,246.82 to Schaffan met all the statutory requisites of a D reorganization. The Schaffans urge, however, that two nonstatutory requirements must be satisfied before a transaction, characterized by a taxpayer as a liquidation, may be treated as a reorganization: tax avoidance motive and a continuity of business enterprise.[7]
 
 
 19
 The Tax Court, while expressing some skepticism about the absence of a tax avoidance motive in structuring the transaction, held that a finding of such a motive was not required. The Schaffans, in advancing their tax avoidance motive argument, rely on cases such as Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), which held that taxpayers cannot take advantage of the tax-free reorganization provisions of the Code in the absence of a business purpose for the transaction other than a purpose to avoid taxes. That requirement was imposed to prevent the resort to liquidation and reincorporation as a way of bailing out earnings and profits without appropriate payment of taxes.
 
 
 20
 There is no disagreement among the parties that a business purpose is required for a reorganization.[8] The Schaffans contend that there was a business purpose for liquidation as opposed to reincorporation, and that from this business purpose for liquidation one can infer a non-tax avoidance motive for the overall transaction. However, the liquidation-reincorporation doctrine is aimed at recharacterizing liquidations in light of the entire transaction, notwithstanding liquidation motives.[9] Thus the liquidation purpose alone, and therefore the inference of a non-tax avoidance motive from it, cannot by definition be dispositive, and certainly does not prevent the characterization of the transaction as a D reorganization.[10]
 
 
 21
 The Treasury Regulations state the essence of the requirement as:
 
 
 22
 (t)he readjustments involved in the exchanges or distributions effected in the consummation (of a plan of reorganization) must be undertaken for reasons germane to the continuance of the business of a corporation a party to the reorganization.
 
 
 23
 26 C.F.R. § 1.368-2(g) (1979). The focus of the nonstatutory test is not, therefore, whether there were tax avoidance motives, but whether, objectively, there was continuity of business rather than termination of business. It is not significant that one party to the transaction was liquidated since that is a fairly common feature of a reorganization.[11] What is critical is whether the new corporation carries forward the business enterprise of the old. The continuity of interest concept is "at the heart of the nonrecognition provisions."[12]
 
 
 24
 Sometimes, a taxpayer will seek to establish that the reorganization took place, thus postponing payment of any tax. In other cases, especially where, as here, there is a distribution of liquid assets, the taxpayer will prefer to have the liquidation aspect separated from the rest of the transaction so as to qualify for capital gains treatment. In response, the Commissioner will seek to treat all the events as one transaction and thus characterize it as a reorganization in order to tax the distribution under section 356(a) at ordinary income rates. The subjective motivation of neither the taxpayer nor the Commissioner is relevant. The test must be whether, objectively, the transferee corporation, if it otherwise qualifies for reorganization treatment, has a continuity of business enterprise with the transferor corporation. Thus we agree with the Tax Court that there was no requirement that it find a tax avoidance motive in order to classify the transaction as a D reorganization.
 
 
 25
 While the Schaffans urge that there was no continuity of business enterprise, the record establishes otherwise. Schaffan testified:
 
 
 26
 The reason I had Fletcher Plastic's assets go to Atlas was, as I had explained, as a hedge so that should anything happen we've got insurance in the form of the machinery or the molds that we could again start manufacturing or could start manufacturing and not be totally without materials.
 
 
 27
 In late 1970, with the increased reliance by Atlas on foreign suppliers, Fletcher's business purpose was precisely the same as Schaffan described the purpose to be for the transfer. Fletcher was manufacturing much fewer components for Atlas than formerly, but was standing by to resume manufacturing if needed. After the transfer, its machinery and equipment remained in place, ready for use. Within four months, the machinery and equipment was placed in operation and within a year all of it was utilized to make the same products as formerly. Atlas retained all of Fletcher's employees. The business enterprise which Atlas conducted was substantially the same as that formerly conducted by Fletcher. Complete identity of business operations is not required.[13] The fact that Fletcher's former business, prior to the transfer, had been substantially curtailed by virtue of the availability of foreign supplies, is not dispositive. Schaffan's business purpose, to provide a hedge against interruption in supplies, carried forward the continuity of enterprise from Fletcher to Atlas. The Tax Court did not err in holding that the Fletcher-Atlas transaction provided the continuity of business enterprise referred to in the Treasury Regulations.[14] Since both the statutory requirements for a D reorganization and the nonstatutory continuity of business enterprise test are on this record satisfied, we must affirm the Tax Court's determination that there was a reorganization and that section 356(a) applies to the distribution of cash from Fletcher to Schaffan.
 
 
 28
 The Commissioner contends that while the Tax Court correctly held that section 356(a) applies, it erred in calculating the amount of Schaffan's gain which should be treated as a dividend. He relies on the interpretation of section 356(a)(2) by the Fifth Circuit in Davant v. Commissioner, 366 F.2d 874, 889 (5th Cir. 1966). In that case, faced with what it considered to be a D reorganization, the court held that where there was identity of stock interest in the two corporations, the distributing corporation and the acquiring corporation, the earnings and profits for purposes of section 356(a)(2) would be determined by the earnings and profits of both corporations. The Commissioner concedes that, in the absence of such identity of interest, the reference in section 356(a)(2) to the taxpayer's "ratable share of the undistributed earnings and profits of the corporation" is a reference to the undistributed earnings and profits of the distributing corporation. He insists, and the Davant court held, that the statutory language should, where stock ownership in both corporations is identical, be read to mean "both corporations."
 
 
 29
 Neither the Commissioner nor the Davant opinion refer us to any legislative history which would support a rewriting of section 356(a)(2), and we see no policy reasons which support our doing so. It is true that Schaffan owns all the stock in both corporations, and that some of the funds distributed by Fletcher came from Atlas as a result of Atlas' purchase of machinery, equipment, and inventory. It is also true that because the transaction is treated as a reorganization the transfer from Fletcher to Atlas is not taxable. The tax-free nature of the transfer introduces the possibility that, by overvaluing the Fletcher assets, Schaffan could transfer earnings and profits out of Atlas. But thereby he would necessarily increase the earnings and profits of Fletcher, and thus the amount qualifying for section 356(a)(2) treatment.
 
 
 30
 If in the future we are faced with the situation where a single taxpayer causes a transfer of business assets at inflated prices from a corporation with accumulated losses to a corporation with earned surplus, thereby attempting to accomplish capital gains treatment for what should be ordinary income, we are confident that section 482, 26 U.S.C. § 482 (1976), which permits the Secretary to distribute, apportion, or allocate income among related corporations in order to prevent tax evasion, will be a sufficient weapon. The rewriting of section 356(a)(2) does not appear to be necessary. The Tax Court has also rejected Davant.[15] No other court has followed Davant, and we decline to do so. Thus we will affirm the Tax Court holding that the measure of the Schaffan's section 356 liability is the earnings and profits of Fletcher alone.
 
 
 31
 II. Atlas' Liability for Accumulated Earnings Tax
 
 
 32
 Sections 531 and 532 of the Internal Revenue Code impose a tax on accumulated earnings of a corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders, by permitting earnings and profits to accumulate instead of being distributed as dividends.[16] Section 533 of the Code provides that accumulation of earnings and profits that are permitted to accumulate beyond the reasonable needs of the corporation's business shall be determinative of a purpose to avoid shareholder income tax, unless the corporation by a preponderance of the evidence proves to the contrary. The reasonable needs of a business include reasonably anticipated needs.[17] An accumulation of earnings and profits is in excess of reasonable needs if it exceeds the amount that a prudent businessman would consider appropriate for the present and future business needs.[18] To justify an accumulation for future business needs, there must be an indication that the corporation has specific, definite, and feasible plans for use of such accumulation.[19]
 
 
 33
 The Commissioner determined that Atlas was liable for accumulated earnings taxes for its 1969 and 1970 fiscal years. In those years, Atlas produced earnings and profits considerably in excess of the amounts distributed as dividends to Schaffan. It had experienced substantial profits in prior years as well. Since it was not, in the years in question, engaged in manufacturing, a large portion of its assets was in liquid form. Atlas' net liquid assets the excess of its current assets over current liabilities was $2,195,840.13 at the end of 1969 and $2,470,804.76 at the end of 1970. Its annual operating expenses for those years were $4,788,907.43 and $4,781,537.24, respectively. Before the Tax Court, Atlas advanced two reasons for accumulating earnings and profits; ordinary and extraordinary working capital needs, and accumulation for future expansion of plant facilities.
 
 
 34
 In considering Atlas' working capital requirements, the Tax Court applied the so-called operating cycle test. That test permits accumulation of current earnings to cover the reasonably anticipated costs of operating a business for a single operating cycle. Such a cycle is the length of time the money is tied up in inventory and accounts receivable, and thus unavailable for dividend distribution.[20] The length of the cycle is determined by the average inventory turnover period plus the average accounts receivable turnover period, less the average accounts payable turnover period. The Tax Court determined that Atlas' inventory turnover period was 1.33 months and the accounts receivable turnover period was 2 months, for a total sum of 3.33 months. The court made no deduction for an accounts receivable turnover period because it found that at least half of the inventory, purchased from foreign suppliers, was paid for by letter of credit in effect prepaid. Thus, it concluded that the operating cycle was 3.33 months, or 27.75 percent of the year. To determine Atlas' working capital needs, the court applied that percentage to the total annual operating expenses for the years in question, thus finding working capital needs for 1969 of $1,328,921.72. Because the working capital needs in 1970 differed only slightly, the court allowed the same amount, $1,328,921.72, for that year. As noted above, Atlas had net liquid assets in each year far in excess of that amount. The court found at the beginning of fiscal 1969, accumulated earnings and profits of $1,812,733.70, and at the beginning of fiscal 1970, accumulated earnings and profits of $2,181,196.70. Considering its net liquid assets these accumulations could not be justified as needed for working capital needs.
 
 
 35
 Nor did the Tax Court accept Atlas' explanation that all the accumulations were justified by the need for future plant expansions. The Atlas plant had undergone a major expansion in 1968. While its successful history might require future plant expansion, it had in 1969 no specific, definite, and feasible plan for such expansion. The court concluded that in 1969, Atlas could not justify accumulation of earnings and profits beyond its normal working capital needs. For the fiscal year 1970, however, the Tax Court credited testimony that Atlas had begun to plan for a future expansion and reasonably could need to accumulate $339,000 in that year. It added that sum to the $1,328,921.72 for the fiscal year 1970. But even this total of $1,667,921.72 was exceeded by the $1,812,733.70 in accumulated earnings and profits with which the year opened.
 
 
 36
 Atlas argues that the preponderance of evidence is that its accumulations did not go beyond its reasonably anticipated needs. The findings of the Tax Court, however, must be affirmed unless clearly erroneous.[21] We do not find them so. And to the extent that Atlas urges that the application of the operating cycle test for determining working capital needs was legal error, we reject that contention. The test affords a reasonable formula for making the factual determination required by section 533.
 
 
 37
 Once it was determined that Atlas had accumulated earnings beyond the reasonable needs of the business, the burden was upon Atlas to show that it had not been availed of for the purpose of avoiding shareholder income tax. Noting that Atlas' dividends were small compared to its earnings, that Schaffan's salary was not substantial, and that his marginal tax rate was higher than the corporation's, the Tax Court held that this burden had not been carried. Here, again, the Tax Court's findings of fact are not clearly erroneous.
 
 
 38
 III. Atlas' Transferee Liability For Fletcher's Tax Obligation
 
 
 39
 The Commissioner determined that Fletcher also accumulated earnings beyond the reasonable needs of its business, and imposed an accumulated earnings tax for its fiscal years ending November 30, 1968 and 1969. This Fletcher liability is not disputed. A deficiency notice was mailed to Atlas as Fletcher's successor. The Tax Court held that the tax was collectible from Atlas, as transferee, by virtue of section 6901(a)(1)(A).[22] That section permits collection from a transferee if under the governing state law the transferee would be liable for the transferor's debts. The state law in issue is that of New Jersey, and the Tax Court concluded that New Jersey would treat the Fletcher-Atlas transaction as a de facto merger, and a continuation of Fletcher's business.
 
 
 40
 Normally, a corporation that purchases all of the assets of another corporation is not liable for the debts of the transferor.[23] However, the New Jersey courts have formulated exceptions to the rule in the context of personal injury/products liability and minority appraisal suits. The leading New Jersey case is McKee v. Harris-Seybold Co., 109 N.J.Super. 555, 264 A.2d 98 (Super.Ct.Law Div. 1970), aff'd per curiam, 118 N.J.Super. 480, 288 A.2d 585 (Super.Ct.App.Div. 1972). The McKee court noted five exceptions, two of which are relevant here: (1) "the transaction amounts to a consolidation or merger of the seller and purchaser; (2) the purchasing corporation is merely a continuation of the selling corporation." 109 N.J.Super. at 561, 264 A.2d at 101.
 
 
 41
 De facto mergers have been found where a sale is really a merger one corporation absorbing the other, the absorbed corporation going out of existence and losing its identity to the absorbing corporation that remains. In de facto situations, the factors considered have included: (1) continuation of the same shareholder control particularly in the instance of a sole shareholder, (2) intention to dissolve the selling company, (3) retention of executive and operating personnel of the vendor by the transferee, (4) transfer of assets and shares, (5) assumption of vendor's liabilities, (6) a "pooling of interests."[24] Most of these elements are present in the case sub judice. Moreover, every factor is not essential for applying the doctrine. Good v. Lackawanna Leather Co., 96 N.J.Super. 439, 452, 233 A.2d 201, 208 (Super.Ct.Ch.Div. 1967). However, in Good, the court found that because most of the elements were missing, particularly the transfer of assets in exchange for shares, the de facto doctrine did not apply. See id.
 
 
 42
 In Wilson v. Fare Well Corp., 140 N.J.Super. 476, 356 A.2d 458 (Super.Ct.Law Div. 1976), the court found the de facto doctrine applicable because there was continuity of management, personnel, physical location, assets, general business operations, shareholders, and the seller had ceased operations and the transferee had assumed the continuation of the business. The court while recognizing the McKee factors, adopted the "modern, fair-minded broad approach" to the doctrine. 140 N.J.Super. at 493, 356 A.2d at 468.
 
 
 43
 In Shannon v. Samuel Langston Co., 379 F.Supp. 797 (W.D.Mich. 1974), the court found a de facto merger under New Jersey law where there was a continuation of the shareholders and business enterprise and the transferor had liquidated.
 
 
 44
 As is illustrated by the de facto merger cases, that exception is interrelated to the second exception for continuity. In McKee, there was no evidence of continuity of management or stockholder investment and the transferor did not liquidate until two years after the sale, although the purchaser presumably did continue the manufacturing operations. "For liability to attach, the purchasing corporation must represent merely a 'new hat' for the seller." McKee v. Harris-Seybold Co., 109 N.J.Super. at 570, 264 A.2d at 106. Certainly, in the case at bar there is continuity of shareholder investment and Fletcher was liquidated almost immediately. However, even in a case where the transferor corporation liquidated soon after the sale, this was held not to be dispositive. Menacho v. Adamson United Co., 420 F.Supp. 128 (D.N.J. 1976) (no de facto merger). Menacho is distinguishable from the case at bar because the Menacho court found that there was no continuity of management or control. 420 F.Supp. at 134-35.
 
 
 45
 In Jackson v. Diamond T. Trucking Co., 100 N.J.Super. 186, 241 A.2d 471 (Super.Ct.Law Div. 1968), the court held a transferee corporation liable for the transferor under the continuation exception. The court noted that the factual conclusion that the transferee corporation was a continuation of the transferor did not necessarily lead to imposing liability because a weighing of policy factors was required. The courts that have found a de facto merger or a continuation of the enterprise have involved public policy considerations which favor compensating tort victims or appraisal rights to minority shareholders.[25] We do not believe that the New Jersey courts would regard the favored public policy of the collection of the federal revenue any less highly.
 
 
 46
 Under the case law discussed, continuity is the basis and test for both the de facto and continuity doctrines. Although, there was no stock transfer here, and only cash was involved, there was clearly a continuation of stockholder interest. The stock exchange element of the de facto doctrine appears to be aimed at measuring continuity of stockholder interest. Moreover, it was not unreasonable for the Tax Court to find adequate continuity of the business activity by Atlas for the reasons it found such continuity under section 368, 26 U.S.C. § 368 (1976). Atlas purchased all the operating machinery and inventory, utilized the machinery for the same purposes, retained it in the same location, retained the same employees, and the transferor company was liquidated almost immediately. Thus we hold that the Tax Court did not err in holding that under New Jersey law, Atlas was liable for Fletcher's tax obligations, and that those obligations could be collected pursuant to section 6901(a)(1)(A).[26]
 
 IV. Conclusion
 
 47
 The decision of the Tax Court will be affirmed in all respects.
 
 
 
 *
 Hon. Charles R. Weiner, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The decision of the Tax Court is reported at 70 T.C. 86 (1978)
 
 
 [2]
 Alternatively, the Commissioner contended that these were, in substance, two separate dividend distributions: Schaffan received a $381,996.82 dividend from Fletcher, and a dividend of $100,250 from Atlas because the sale of assets was merely an attempt to bail out earnings and profits of Atlas at capital gains rates. The alternative theory is not pressed here
 
 
 [3]
 See Davant v. Commissioner, 366 F.2d 874, 886-87 (5th Cir. 1966) cert. denied, 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460 (1967); James Armour, Inc. v. Commissioner, 43 T.C. 295, 307 (1964); Commissioner v. Morgan, 288 F.2d 676, 680 (3d Cir. 1961), cert. denied, 368 U.S. 836, 82 S.Ct. 32, 7 L.Ed.2d 37 (1961)
 
 
 [4]
 Wilson v. Commissioner, 46 T.C. 334, 344 (1966); James Armour, Inc. v. Commissioner, 43 T.C. at 307; cf. Commissioner v. Morgan, 288 F.2d at 680
 
 
 [5]
 See American Mfg. Co. v. Commissioner, 55 T.C. 204, 221-22 (1970) (transfer of operating assets sufficient; receivables and cash not necessary to conduct business); Reef Corp. v. Commissioner, 368 F.2d 125, 131 (5th Cir. 1966), cert. denied, 386 U.S. 1018, 87 S.Ct. 1371, 18 L.Ed.2d 454 (1967) (transfer of operating assets without liquid cash assets qualified as substantially all); Moffat v. Commissioner, 363 F.2d 262, 268 (9th Cir. 1966), cert. denied, 386 U.S. 1016, 87 S.Ct. 1370, 18 L.Ed.2d 453 (1967) (transfer of key personnel and operating assets qualified as substantially all); James Armour, Inc. v. Commissioner, 43 T.C. at 309 (transfer of cash and receivables not necessary to qualify as substantially all); cf. DeGroff v. Commissioner, 444 F.2d 1385, 1386 (10th Cir. 1971) (substantially all requirement met without actual transfer where taxpayer owned and controlled both corporations). But cf. Swanson v. United States, 479 F.2d 539, 545-46 (9th Cir. 1973) (no satisfaction of substantially all requirement due to failure to transfer essential liquid assets)
 
 
 [6]
 Wilson v. Commissioner, 46 T.C. at 345; see Grubbs v. Commissioner, 39 T.C. 42, 49-50 (1962)
 
 
 [7]
 The continuity of business enterprise is one of two subparts of the continuity of interest requirement. The continuity of the proprietary interest held by shareholders of the transferor corporation is imposed under section 368(a)(1)(D) and is not disputed here
 
 
 [8]
 See Reply Brief for Appellants-Cross Appellees at 3-4; Brief for Commissioner as Appellee and Cross-Appellant at 30-33
 
 
 [9]
 See James Armour, Inc. v. Commissioner, 43 T.C. at 305; Moffat v. Commissioner, 363 F.2d at 266; cf. Degroff v. Commissioner, 444 F.2d at 1386
 
 
 [10]
 But cf. Pridemark, Inc. v. Commissioner, 345 F.2d 35, 41 (4th Cir. 1965), overruled in different part, Of Course, Inc. v. Commissioner, 499 F.2d 754 (4th Cir. 1974) (holding no reorganization because reincorporation was not to avoid taxes where liquidated company, a dealer in prefabricated homes, had sold all its assets to unrelated purchaser and shareholders had incorporated new corporation with same business a year later.' The holding in Pridemark rests, in part, on the lack of continuity of business enterprise due to the suspension of business activity. See id. at 41 & n.7
 
 
 [11]
 See Lewis v. Commissioner, 176 F.2d 646, 649 (1st Cir. 1949)
 
 
 [12]
 B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, P 14.01 at 14-3 (abridged ed. 1971)
 
 
 [13]
 See American Bronze Corp. v. Commissioner, 64 T.C. 1111, 1123-24 (1967) (continuity does not "import a requirement of identity; the continuing business need not be the same as that conducted by the transferror."); Becher v. Commissioner, 221 F.2d 252, 253 (2d Cir. 1955)
 
 
 [14]
 See 26 C.F.R. 1.368-1(b) (1979)
 
 
 [15]
 See Estate of Bell v. Commissioner, 30 T.C.M. (CCH) 1221, 1225 (1971); American Mfg. Co. v. Commissioner, 55 T.C. at 231
 
 
 [16]
 See 26 U.S.C. §§ 531, 532 (1976)
 
 
 [17]
 See 26 U.S.C. § 537 (1976)
 
 
 [18]
 26 C.F.R. § 1.537-1(a) (1979)
 
 
 [19]
 Cheyenne Newspapers, Inc. v. Commissioner, 494 F.2d 429, 433 (10th Cir. 1974); Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 331 (1968); 26 C.F.R. § 1.537-1(b) (1979)
 
 
 [20]
 See Bardahl Int'l Co., T.C.M. (P-H) P 66,182 (1966); Bardahl Mfg. Corp., T.C.M. (P-H) P 65,200 (1965); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders P 8.03 at 8-15 to 8-16 (1971 abridged ed.)
 
 
 [21]
 Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Nemours Corp. v. Commissioner, 325 F.2d 559, 560 (3d Cir. 1963)
 
 
 [22]
 26 U.S.C. § 6901(a)(1)(A) (1976)
 
 
 [23]
 15 Fletcher Cyc. Corp. P 7122 at 188 (perm. ed. 1973)
 
 
 [24]
 McKee v. Harris-Seybold Co., 109 N.J.Super. at 564, 264 A.2d at 103; Applestein v. United Board & Carton Corp., 60 N.J.Super. 333, 348, 159 A.2d 146, 154 (Super.Ct.Ch.Div.), aff'd per curiam, 33 N.J. 72, 161 A.2d 474 (1960)
 
 
 [25]
 See Knapp v. North American Rockwell Corp., 506 F.2d 361, 367 (3d Cir. 1974), cert. denied, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975) (decided under Pa. law)
 
 
 [26]
 26 U.S.C. § 6901(a)(1)(A) (1976)