**J. E. SMOTHERS and Doris Smothers,
Plaintiffs-Appellants,**

v.

**UNITED STATES of America,
Defendant-Appellee.**

No. 79–1876.

United States Court of Appeals,
Fifth Circuit.

Unit A

April 17, 1981.

Rehearing Denied May 26, 1981.

Robert B. Wallace, Corpus Christi, Tex., for plaintiffs-appellants.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Richard Farber, James A. Riedy, Chief Appellate Sec., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before WISDOM, GARZA and REAVLEY, Circuit Judges.

WISDOM, Circuit Judge:

J. E. and Doris Smothers filed this civil action to obtain a refund of federal income taxes they paid under protest. This dispute arises from the dissolution of one of their wholly-owned business corporations. The taxpayers contend that the assets distributed to them by that corporation should be taxed at the capital gain rate applicable to liquidating distributions. The Internal Revenue Service (IRS) counters by characterizing the dissolution as part of a reorganization, thereby rendering the taxpayers' receipt of the distributed assets taxable at ordinary income rates. The district court viewed the transaction as a reorganization and ruled for the IRS. We affirm.

## I.

The facts were stipulated. J. E. and Doris Smothers are married and reside in Corpus Christi, Texas. In 1956, they and an unrelated third party organized Texas Industrial Laundries of San Antonio, Inc. (TIL). The Smothers' owned all of its outstanding stock from 1956 through the tax year in issue, 1969. TIL engaged in the business of renting industrial uniforms and other industrial cleaning equipment, such as wiping cloths, dust control devices, and continuous toweling. It owned its own laundry equipment as well.

Shortly after the incorporation of TIL, the taxpayers organized another corporation, Industrial Uniform Services, Inc. (IUS), specifically to oppose a particular

competitor in the San Antonio industrial laundry market. The taxpayers owned all of the stock of IUS from the time of its organization until its dissolution. Unlike TIL, IUS did not own laundry equipment; it had to contract with an unrelated company to launder the uniforms it rented to customers. J. E. Smothers personally managed IUS, as well as TIL, but chose not to pay himself a salary from IUS in any of the years of its existence.[1]

IUS evidently succeeded in drawing business away from competing firms, for TIL purchased its main competitor in 1965. IUS continued in business, however, until 1969. On the advice of their accountant, the taxpayers then decided to dissolve IUS and sell all of its non-liquid assets to TIL. On November 1, 1969, IUS adopted a plan of liquidation in compliance with I.R.C. § 337,[2] and on November 30, it sold the following assets to TIL for cash at their fair market value (stipulated to be the same as their book value):

| Assets | Amount |
|---|---|
| Noncompetitive covenant | $ 3,894.60 |
| Fixed assets | 491.25 |
| Rental Property | 18,000.00 |
| Prepaid insurance | 240.21 |
| Water deposit | 7.50 |
| Total | $22,637.56[3] |

The noncompetitive covenant constituted part of the consideration received by IUS from its purchase of a small competitor. The fixed assets consisted of incidental equipment (baskets, shelves, and a sewing machine), two depreciated delivery vehicles, and IUS's part interest in an airplane. The rental property was an old apartment build-

ing in Corpus Christi on land with business potential. These assets collectively represented about 15% of IUS's net value. The parties stipulated that none of these assets were necessary to carry out IUS's business.

After this sale, IUS promptly distributed its remaining assets to its shareholders, the taxpayers, and then dissolved under Texas law:

| Assets | Amount |
|---|---|
| Cash (received from TIL) | $ 22,637.56 |
| Cash (of IUS) | 2,003.05 |
| Notes receivable | 138,000.00 |
| Accrued interest receivable | 35.42 |
| Claim against the State of Texas | 889.67 |
| Liabilities assumed | (14,403.35) |
| Total | $149,162.35 |

TIL hired all three of IUS's employees immediately after the dissolution, and TIL continued to serve most of IUS's customers.

In computing their federal income tax liability for 1969, the taxpayers treated this distribution by IUS as a distribution in complete liquidation within § 331(a)(1). Accordingly, they reported the difference between the value of the assets they received in that distribution, $149,162.35, and the basis of their IUS stock, $1,000, as long-term capital gain. Upon audit, the IRS recharacterized the transaction between TIL and IUS as a reorganization within § 368(a)(1)(D), and therefore treated the distribution to the taxpayers as equivalent to a dividend under § 356(a)(2). Because IUS had sufficient earnings and profits to cover that distribution, the entire distribution was therefore taxable to the Smothers' at ordinary income rates. The IRS timely assessed a $71,840.84 deficiency against the Smothers'. They paid that amount and filed this suit for a refund.

---

**1.** Although the record does not specifically so indicate, and although it is unnecessary to our resolution of this case, we think it instructive to note that IUS apparently did not pay any dividends during its existence, either. We deduce that from the following facts of record: (1) the Smothers' cost basis in their IUS stock was $1000.00; (2) IUS had "approximately $148,162.35" in accumulated earnings and profits at the time of its dissolution; (3) IUS's book value at the time of its dissolution was $149,-162.35.

**2.** All citations are to the Internal Revenue Code of 1954, Title 26 of the United States Code.

**3.** The parties stipulated that the purchase price was $22,637.56, and the district court found that as a fact. The items listed add to $22,-633.56, however. We ignore the discrepancy and accept the stipulation.

The district court held that the transaction constituted a reorganization and rendered judgment for the IRS. *United States v. Smothers*, S.D.Tex.1979, 79–1 U.S.Tax. Cas. 86,414, 45 A.F.T.R.2d 80–596.

## II.

Subchapter C of the Internal Revenue Code broadly contemplates that the retained earnings of a continuing business carried on in corporate form can be placed in the hands of its shareholders only after they pay a tax on those earnings at ordinary income rates. That general rule is, of course, primarily a consequence of § 301, which taxes dividend distributions as ordinary income. The Code provides for capital gain treatment of corporate distributions in a few limited circumstances, but only when there is either a significant change in relative ownership of the corporation, as in certain redemption transactions,[4] or when the shareholders no longer conduct the business themselves in corporate form, as in true liquidation transactions.[5] The history of Subchapter C in large part has been the story of how Congress, the courts, and the IRS have been called upon to foil attempts by taxpayers to abuse these exceptional provisions. Ingenious taxpayers have repeatedly devised transactions which formally come within these provisions, yet which have the effect of permitting shareholders to withdraw profits at capital gain rates while carrying on a continuing business enterprise in corporate form without substantial change in ownership. This is just such a case.

The transaction in issue here is of the genus known as liquidation-reincorporation, or reincorporation.[6] The common denominator of such transactions is their use of the liquidation provisions of the Code, which permit liquidating distributions to be received at capital gain rates, as a device through which the dividend provisions may be circumvented.[7] Reincorporations come in two basic patterns. In one, the corporation is dissolved and its assets are distributed to its shareholders in liquidation. The shareholders then promptly reincorporate all the assets necessary to the operation of the business, while retaining accumulated cash or other surplus assets. The transaction in this case is of the alternate form. In it, the corporation transfers the assets necessary to its business to another corporation owned by the same shareholders in exchange for securities or, as here, for cash, and then liquidates. If the minimal technical requirements of § 337 are met, as they indisputably were here, the exchange at the corporate level will not result in the recognition of gain by the transferor corporation. If formal compliance with the liquidation provisions were the only necessity, both patterns would enable shareholders to withdraw profits from a continuing corporate business enterprise at capital gain rates by paper-shuffling. Unchecked, these reincor-

---

4.  *See, e. g.*, I.R.C. § 302(b).

5.  *See* I.R.C. § 331.

6.  There is a wealth of useful literature on the subject, including at least one treatise. J. Hewitt & J. Cuddihy, The Liquidation-Reincorporation Problem: A Running Tax Battle (1969). *See also* Note, *New Answers to the Liquidation-Reincorporation Problem*, 76 Colum.L.Rev. 268 (1976); Wood, *A Proposed Treatment of Reincorporation Transactions*, 25 Tax.L.Rev. 282 (1970); *Pugh, The F Reorganization: Reveille for a Sleeping Giant?*, 24 Tax.L.Rev. 437 (1969); Surkin, *The Reincorporation Quandary Under Sections 368(a)(1)(D) and 354(b)(1): Comments on Moffatt v. Commissioner*, 53 Cornell L.Rev. 575 (1968); Lane, *The Reincorporation Game: Have the Ground Rules Really Changed?*, 77 Harv.L.Rev. 1218 (1964); MacLean, *Problems of Reincorporation and Relat-*

ed *Proposals of the Subchapter C Advisory Group*, 13 Tax.L.Rev. 407 (1958). *See generally* F. Nicholson, Liquidation-Reincorporation, BNA Tax Mgt. Portfolio No. 335 (1976); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 14.54 (4th ed. 1979).

7.  Other tax benefits may be reaped from reincorporation transactions in appropriate circumstances: *e. g.*, elimination of the earnings and profits account of the old corporation in order to avoid the § 531 tax on unreasonable accumulation; and a step-up in the tax basis of depreciable corporate assets at capital gain rates to the extent permitted by § 1245 and § 1250. In light of IUS's relatively large earnings and profits account, the former benefit is not a trivial one here.

poration techniques would eviscerate the dividend provisions of the Code.

That result can be avoided by recharacterizing such transactions, in accordance with their true nature, as reorganizations. A reorganization is, in essence, a transaction between corporations that results merely in "a continuance of the proprietary interests in the continuing enterprise under modified corporate form"—a phrase that precisely describes the effect of a reincorporation. *Lewis v. Commissioner*, 1 Cir. 1949, 176 F.2d 646, 648.[8] Congress specifically recognized that the throw-off of surplus assets to shareholders in the course of a reorganization can be equivalent to a dividend, and if so, should be taxed as such. §§ 356(a)(1)–(2). The reincorporation transactions described above result in a dividend payment to the shareholders in every meaningful financial sense. The assets retained by the shareholders therefore should be taxed as dividends as long as the transaction can be fitted within the technical requirements of one of the six classes of reorganizations recognized by § 368(a)(1).

In general, reincorporation transactions are most easily assimilated into § 368(a)(1)(D) ("D reorganization"), as the IRS attempted to do in this case.[9] A transaction qualifies as a D reorganization only if it meets six statutory requirements:

(1) There must be a transfer by a corporation (§ 368(a)(1)(D));

(2) of substantially all of its assets (§ 354(b)(1)(A));

(3) to a corporation controlled by the shareholders of the transferor corporation, or by the transferor corporation itself (§ 368(a)(1)(D));

(4) in exchange for stock or securities of the transferee corporation (§ 354(a)(1));

(5) followed by a distribution of the stock or securities of the transferee corporation to the transferor's shareholders (§ 354(b)(1)(B));

(6) pursuant to a plan of reorganization (§ 368(a)(1)(D)).

On this appeal, the taxpayers concede that the transaction in issue meets every technical prerequisite for characterization as a D reorganization, except for one. They argue that since the assets sold by IUS to TIL amounted to only 15% of IUS's net worth, TIL did not acquire "substantially all of the assets" of IUS within the meaning of § 354(b)(1)(A).

■ We hold to the contrary. The words "substantially all assets" are not self-defining. What proportion of a corporation's assets is "substantially all" in this context, and less obviously, what "assets" are to be counted in making this determination, can-

8. *See also, e. g.*, Treas.Reg. § 1.368–1(b) (1960) (transactions "which effect only a readjustment of continuing interest in property under modified corporate form"); *Bazley v. Commissioner*, 1947, 331 U.S. 737, 740, 67 S.Ct. 1489, 91 L.Ed. 1782 (reorganization when "a formal distribution, directly or through exchange of securities, represents merely a new form of the previous participation in an enterprise, involving no change of substance in the rights and relations of interested parties one to [sic] another or to the corporate assets").

9. Reincorporations may also fit within § 368(a)(1)(F) ("[a] mere change in identity, form or place of organization, however effected"). *See Davant v. Commissioner*, 5 Cir. 1966, 366 F.2d 874, 883–84, *cert. denied*, 1967, 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460; *Reef Corp. v. Commissioner*, 5 Cir. 1966, 368 F.2d 125, 133–37, *cert. denied*, 1967, 386 U.S. 1018, 87 S.Ct. 1371, 18 L.Ed.2d 454. The government did not press that theory on appeal. Doubtless that owes to its general reluctance to extend the scope of § 368(a)(1)(F) to acquisitive reorganizations, which derives from the fact that net operating losses may be carried back after an F reorganization. § 381(b)(3). *See generally* Cohen, *The "New F" Reorganization*, 36 N.Y.U.Inst.Fed.Tax. 833 (1978). The IRS has in the past occasionally advanced more exotic arguments against reincorporations—*e. g.*, the theory that no real "liquidation" occurs in such transactions, and the theory that even if a liquidation does occur, the distribution of surplus assets is a dividend functionally unrelated to the liquidation—but it did not so argue here. *Cf.* Rev.Rul. 61–156, 1961–2 C.B. 62; *Telephone Answering Service Co. v. Commissioner*, 1974, 63 T.C. 423, *aff'd*, 4 Cir. 1976, 546 F.2d 423, *cert. denied*, 1977, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224; *Breech v. United States*, 9 Cir. 1971, 439 F.2d 409; *Joseph C. Gallagher*, 1962, 39 T.C. 144, *acq. and nonacq.*, 1964–2 C.B. 5, 9.

not be answered without reference to the structure of Subchapter C. To maintain the integrity of the dividend provisions of the Code, "substantially all assets" in this context must be interpreted as an inartistic way of expressing the concept of "transfer of a continuing business". As this Court implied in *Reef Corp. v. Commissioner,* 5 Cir. 1966, 368 F.2d 125, 132, *cert. denied,* 1967, 386 U.S. 1018, 87 S.Ct. 1371, 18 L.Ed.2d 454, it is in a sense simply a limited codification of the general nonstatutory "continuity of business enterprise" requirement applicable to all reorganizations.

This interpretation finds support in the history of § 368(a)(1)(D) and § 354(b)(1)(A). The Internal Revenue Code of 1939 had no provision equivalent to the "substantially all assets" requirement, and courts almost uniformly approved attempts by the IRS to treat reincorporation transactions as reorganizations within the predecessor of § 368(a)(1)(D) in the 1939 Code.[10] The "substantially all assets" requirement of § 354(b)(1)(A) and the amendment of § 368(a)(1)(D) incorporating that requirement were added during the 1954 recodification as part of a package of amendments aimed at plugging a different loophole—the bail-out of corporate earnings and profits at capital gains rates through divisive reorganizations. There is no indication that Congress wished to relax the application of the reorganization provisions to reincorporation transactions. Indeed, the committee reports indicate the contrary. The Senate report accompanying the bill that contained the "substantially all assets" requirement of § 354(b)(1)(A) and the parallel amendment to § 368(a)(1)(D) stated that the purpose of those changes was only "to insure that the

tax consequences of the distribution of stocks or securities to shareholders or security holders in connection with divisive reorganizations will be governed by the requirements of section 355".[11] The report expressly noted that except with respect to divisive reorganizations, the reorganization provisions "are the same as under existing law and are stated in substantially the same form".[12] Even more significantly, the original House version of the 1954 Code contained a provision specifically dealing with reincorporation transactions. That provision was dropped in conference because the conferees felt that such transactions "can appropriately be disposed of by judicial decision or by regulation within the framework of the other provisions of the bill".[13] As the court said in *Pridemark, Inc. v. Commissioner,* 4 Cir. 1965, 345 F.2d 35, 40, this response shows that "the committee was aware of the problem and thought the present statutory scheme adequate to deal with it". By implication, this passage approved the IRS's use of the predecessor of § 368(a)(1)(D) to meet the problem, and shows that the "substantially all assets" amendment was not thought to restrict its use.

Courts have almost unanimously so interpreted the "substantially all assets" language. Moreover, they have also interpreted the other technical conditions for a D reorganization in ways that accomplish the congressional intent to reach reincorporation transactions. For example, the literal language of § 368(a)(1)(D) and §§ 354(a), 354(b)(1)(B) requires that the transferee corporation "exchange" some of its "stock or securities" for the assets of the transfer-

---

10. *See, e. g., Liddon v. Commissioner,* 6 Cir. 1956, 230 F.2d 304, *cert. denied,* 1956, 352 U.S. 824, 77 S.Ct. 34, 1 L.Ed.2d 48; *Becher v. Commissioner,* 2 Cir. 1955, 221 F.2d 252; *Lewis v. Commissioner,* 1 Cir. 1949, 176 F.2d 646; *Bard-Parker Co. v. Commissioner,* 2 Cir. 1954, 218 F.2d 52, *cert. denied,* 1955, 349 U.S. 906, 75 S.Ct. 582, 99 L.Ed. 1242; *Survaunt v. Commissioner,* 8 Cir. 1947, 162 F.2d 753; *Pebble Springs Distilling Co. v. Commissioner,* 7 Cir. 1956, 231 F.2d 288, *cert. denied,* 1956, 352 U.S. 836, 77 S.Ct. 56, 1 L.Ed.2d 55. *But see United States v. Arcade Co.,* 6 Cir. 1953, 203 F.2d 230,

*cert. denied,* 1953, 346 U.S. 826, 74 S.Ct. 48, 98 L.Ed. 352. *See generally* MacLean, *supra* note 4, at 409–13, 417–19.

11. S.Rep.No.1622, 83d Cong., 2d Sess. 274 (1954), *reprinted in* [1954] U.S.Code Cong. & Ad.News 4621, 4912–13.

12. *Id.* at 265, *reprinted in id.* at 4903.

13. H.R.Rep.No.2543, 83d Cong., 2d Sess. 41 (1954), *reprinted in* [1954] U.S.Code Cong. & Ad.News 5280, 5301.

or, and that those items be "distributed" to the shareholders of the transferor, before a D reorganization can be found. Yet both of those requirements have uniformly been ignored as "meaningless gestures" in the reincorporation context, in which the same shareholders own all the stock of both corporations.[14] Smothers does not even challenge the applicability of that principle here.

Properly interpreted, therefore, the assets looked to when making the "substantially all assets" determination should be all the assets, and only the assets, necessary to operate the corporate business—whether or not those assets would appear on a corporate balance sheet constructed according to generally accepted accounting principles. Two errors in particular should be avoided. Inclusion of assets unnecessary to the operation of the business in the "substantially all assets" assessment would open the way for the shareholders of any enterprise to turn dividends into capital gain at will. For example, if we assume that "substantially all" means greater than 90%, then a corporation need only cease declaring dividends and accumulate surplus liquid assets until their value exceeds 10% of the total value of all corporate assets. The shareholders could then transfer the assets actively used in the business to a second corporation owned by them and liquidate the old corporation. Such a liquidating distribution would be a dividend in any meaningful sense, but an interpretation of "substantially all assets" that took surplus assets into account would permit the shareholders to treat it as capital gain. Indeed, such an interpretation would perversely treat a merely nominal distribution of retained earnings as a dividend, but would permit substantial distributions to be made at capital gain rates. Courts therefore have invariably ignored all surplus assets and have focused on the operating assets of the business—the tangible assets actively used in the business—when making the "substantially all assets" assessment.[15]

Second, exclusion of assets not shown on a balance sheet constructed according to generally accepted accounting principles from the "substantially all assets" assessment would offer an unjustified windfall to the owners of service businesses conducted in corporate form. The most important assets of such a business may be its reputation and the availability of skilled management and trained employees, none of which show up on a standard balance sheet. Other courts have correctly recognized that in appropriate cases those intangible assets alone may constitute substantially all of the corporate assets.[16] Otherwise, for example,

14. The "meaningless gesture" language is from *James Armour, Inc.*, 1964, 43 T.C. 295, 307. *See also, e. g., Atlas Tool Co. v. Commissioner*, 3 Cir. 1980, 614 F.2d 860, 865, *cert. denied*, 1980, —— U.S. ——, 101 S.Ct. 110, 66 L.Ed.2d 43; *Davant v. Commissioner*, 5 Cir. 1966, 366 F.2d 874, 886–87, *cert. denied*, 1967, 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460; *Ralph C. Wilson*, 1966, 46 T.C. 334, 344. Other technical requirements have been liberally construed in appropriate situations to foil reincorporations. For instance, § 354(b)(1)(B) technically requires that all properties received from the transferor corporation be distributed before a D reorganization can be found, but a "constructive distribution" was found in *David T. Grubbs*, 1962, 39 T.C. 42. Similarly, § 368(a)(1)(D) requires a "plan of reorganization", but a formal written plan is not necessary and the taxpayer's phraseology is not controlling if the transaction is in substance a reorganization. *Atlas Tool Co. v. Commissioner*, 614 F.2d at 866; *Ralph C. Wilson*, 46 T.C. at 345.

15. *See, e. g., Atlas Tool Co. v. Commissioner*, 3 Cir. 1980, 614 F.2d 860, 865, *cert. denied*, 1980, —— U.S. ——, 101 S.Ct. 110, 66 L.Ed.2d 43; *Babcock v. Phillips*, 10 Cir. 1967, 372 F.2d 240, 244, *cert. denied*, 1967, 387 U.S. 918, 87 S.Ct. 2030, 18 L.Ed.2d 970; *Reef Corp. v. Commissioner*, 5 Cir. 1966, 368 F.2d 125, 131, *cert. denied*, 1967, 386 U.S. 1018, 87 S.Ct. 1371, 18 L.Ed.2d 454; *Moffatt v. Commissioner*, 9 Cir. 1966, 363 F.2d 262, 268, *cert. denied*, 1967, 386 U.S. 1016, 87 S.Ct. 1370, 18 L.Ed.2d 453; *American Manufacturing Co. v. Commissioner*, 1970, 55 T.C. 204, 221–22; *James Armour, Inc.*, 1964, 43 T.C. 295, 309. Note that liquid assets are "necessary" to the extent they represent working capital. *See Swanson v. United States*, 9 Cir. 1973, 479 F.2d 539, 545–46; *Ross Michel Simon Trust v. United States*, Ct.Cl. 1968, 402 F.2d 272, 280.

16. *See Moffatt v. Commissioner*, 9 Cir. 1966, 363 F.2d 262, 268 n.2, *cert. denied*, 1967, 386

a sole legal practitioner who owns nothing but a desk and chair could incorporate himself, accumulate earnings, and then set up a new corporation and liquidate the old at capital gain rates—as long as he is careful to buy a new desk and chair for the new corporation, rather than transferring the old.

When these principles are applied to this case, it is plain that "substantially all of the assets" of IUS were transferred to TIL, and that the transaction as a whole constituted a reorganization. TIL and IUS were both managed and wholly owned by Smothers. By the nature of its business, IUS was wholly a service enterprise; indeed, the parties stipulated that none of the tangible assets of IUS were necessary to the operation of its business. The extent to which those tangible assets were transferred to TIL is therefore entirely irrelevant. IUS's most important assets—its reputation, sales staff, and the managerial services of Smothers—were all transferred to TIL. TIL rehired all three of IUS's employees immediately after IUS's liquidation, and continued to serve IUS's old customers.[17] The same business enterprise was conducted by the same people under the same ownership, and the only assets removed from corporate solution were accumulated liquid assets unnecessary to the operation of the business. To treat this transaction as other than a reorganization would deny economic reality; to permit Smothers to extract the retained earnings of IUS at capital gain rates would make a mockery of the dividend provisions of the Internal Revenue Code.

We do not perceive ordinary income treatment here to be particularly harsh, or a "tax trap for the unwary". It places the Smothers' only in the position they would have been in if they had extracted the retained earnings of IUS as the Code contemplates they should have—by periodically declaring dividends.[18]

AFFIRMED.

GARZA, Circuit Judge, dissenting:

After carefully reading the majority's opinion, I find that I must respectfully dissent. Unlike my Brothers, who apparently feel that it is their duty to "plug loopholes", I would remain content in applying the tax law as it reads leaving the United States

U.S. 1016, 87 S.Ct. 1370, 18 L.Ed.2d 453; *Ross Michel Simon Trust v. United States*, Ct.Cl. 1968, 402 F.2d 272, 279–80.

17. The parties stipulated that:
>     18. ... The assets transferred to TIL by IUS were not necessary to the business of IUS and IUS could have continued in the same manner without such assets, so long as J. E. Smothers was willing to head the company without a salary.
>
> .    .    .    .    .
>
>     25. During 1969, IUS had three route salesmen. These salesmen went to work for TIL when IUS ceased doing business and most of their customers followed them.

The stipulation that "most" of the customers followed might be insufficient to show that IUS's business was transferred to TIL if the government had the burden of proof. But this is a refund suit; the taxpayer bears the burden of proof. E. g., *Reinecke v. Spalding*, 1930, 280 U.S. 227, 232–33, 50 S.Ct. 96, 74 L.Ed. 385.

The relatively simple facts of this case make it unnecessary for us to decide whether and when a corporation should be deemed to operate more than one "business". The dissolution of a corporation with more than one line of business conceivably could give rise to a liquidation in part (to the extent that (a) the corporation sells a discrete line of business to an unrelated third party and distributes the proceeds, or (b) the corporation distributes in kind the assets used in a discrete line of business), and to a reorganization in part (to the extent that a line of business is transferred directly or indirectly to another corporation controlled by the same shareholders).

18. Of course, the progressive structure of the income tax in a sense penalizes the plaintiff, since dividend income that could have been spread over many years is concentrated in one year, but that result was avoidable at the taxpayer's discretion. Similarly, he could have taken out some of the earnings in the form of a salary. Note that in all probability, Smothers did not actually defer enjoyment of the retained earnings of IUS until the reincorporation transaction. IUS's major asset by far was $138,000 in "notes receivable". Although the record does not reveal who issued those notes, the inference could be drawn that Smothers took the earnings out of IUS as they were earned, tax-free, by simply borrowing them from the corporation.

Congress to deal with the consequences of the tax law as it has been drafted. The only issue before this Court on appeal is whether or not IUS transferred "substantially all of its assets" to TIL. Instead of dealing with this straightforward question, the majority has made a case of evil against liquidation-reincorporation abuses and, in an attempt to remedy every such perceived abuse, they have relieved the Congress of its burden to change the law heretofore requiring that "substantially all" of a corporation's assets be transferred to now read that "only those assets necessary to operate the corporate business" be transferred in order to meet the "D reorganization" requirements. Essentially, the majority has changed the definition of "substantially all assets" to mean only "necessary operating assets." I believe if Congress had meant "necessary operating assets" it would have said so instead of specifically requiring that "substantially all" of the assets be transferred. In my mind "substantially all" plainly means *all* of the assets except for an *insubstantial* amount. Under such a definition, the sale of 15% of IUS's assets to TIL could hardly be defined as "substantially all" of IUS's assets.

However, even after having redefined "substantially all" to mean "necessary operating assets", the IUS liquidation still falls short of the "D reorganization" requirements because the stipulated facts are that absolutely none of the assets sold from IUS to TIL were necessary operating assets for either corporation. Faced with an absence of a proper factual setting, the majority goes on to define necessary operating assets as including a corporation's intangible assets. Now while a sale of intangible assets might be an appropriate consideration in determining whether or not "substantially all" assets of a corporation have been transferred, such a consideration simply has no bearing in this case. All of the assets transferred to TIL were depreciated tangible objects sold at book value after which IUS completely ceased all business operations. There simply was no other transfer of IUS's intangible assets as a continuing business.

The majority has placed great emphasis on the fact that three of IUS's route salesmen were subsequently employed by TIL and that Mr. Smothers' managerial services were available to TIL. Regardless of whether or not these facts enhanced TIL's business, the fact remains that neither the route salesmen or Mr. Smothers' services were *transferred* as assets from one corporation to another. After IUS ceased business its route salesmen were free to seek any employment they desired. Likewise, Mr. Smothers was never obligated to perform services for TIL. From these facts I cannot agree that there was a transfer of a continuing business. The majority imputes adverse tax consequences to IUS's stockholders simply because TIL offered new employment to the route salesmen who were unemployed upon cessation of IUS's business operations. The majority places future stockholders, in Mr. Smothers' position, of choosing between unfavorable tax consequences and helping secure future employment to loyal and deserving employees whom otherwise would be unemployed.

Although the Internal Revenue Service has never questioned the bona fides of IUS's liquidation, the majority has gone beyond the stipulated facts by characterizing the liquidation as a tax avoidance scam. I simply cannot agree. After starting from scratch, Mr. Smothers worked for over a dozen years refraining from drawing salary in order that IUS could pay its taxes, employees and other operating expenses and in order for IUS to become a successful self-sustaining business enterprise. Mr. Smothers was successful but, now that he no longer could devote his service to IUS, his years of labor are now labeled by the majority as a mere "paper shuffle." I do not share the majority's attitude.

The reasons for my position can be more easily understood by a simple review of the bottom-line facts. After IUS began showing a profit and started accumulating a cash surplus, instead of immediately investing in a building or in other equipment for its operations, it continued its operations as before. Now, if IUS had purchased real

property or depreciable personal property for its operations (instead of leasing as it had been) and had sold these properties pursuant to its plan of liquidation, certainly no argument would be made that the money initially invested in those properties should have been declared by IUS as dividends. However, instead of investing its accumulations, IUS simply put them in its bank account as the tax laws allow and presumably faced any tax consequences posed by such an accumulation.

After IUS ceased operations, was liquidated, and its assets distributed to its stockholders in exchange for their stock, the I.R.S. issued a deficiency, not because IUS was reorganized within the meaning of 26 U.S.C. § 368(a)(1)(D), but rather because the I.R.S. felt the accumulated earnings of IUS coupled with long-term capital gains rates applicable to the stock exchange provided an undesirable windfall to IUS's stockholders. In essence, the I.R.S. sought to expand the "D reorganization" provisions, lessen the availability of long-term capital gains treatment to corporate stockholders, and totally ignore the purpose of the tax upon improperly accumulated surplus as provided in 26 U.S.C. § 531. The majority seeks to do equity for the I.R.S. position by "treating" the IUS liquidation as a "D reorganization." I do not believe the taxpayers or the tax laws are served by upholding an I.R.S. deficiency for the sole purpose of "plugging loopholes." The lesson to be learned from the majority's opinion is clear—future corporations faced with similar circumstances need only invest their otherwise accumulated surplus in some method other than savings. In the process of liquidation they need sell whatever assets exist to third parties unrelated to their stockholders and their stockholders should make no effort to find future employment for the corporation's employees.

It seems to me that in its attempt to "plug" a perceived "loophole," the majority is giving this Court's imprimatur to a variation of the same so-called "mockery" of the tax laws sought to be prevented by its opinion.

For these reasons, I respectfully dissent.